**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, CHARLESTON WATERKEEPER, AMERICAN RIVERS, CHATTAHOOCHEE RIVERKEEPER, CLEAN WATER ACTION, DEFENDERS OF WILDLIFE, FRIENDS OF THE RAPPAHANNOCK, NORTH CAROLINA COASTAL FEDERATION, and NORTH CAROLINA WILDLIFE FEDERATION, <br><br> Plaintiffs, <br><br> v. <br><br> E. SCOTT PRUITT, in his official capacity as Administrator of the U.S. Environmental Protection Agency; the U.S. ENVIRONMENTAL PROTECTION AGENCY; RYAN FISHER, in his official capacity as Acting Assistant Secretary of the Army (Civil Works); and the U.S ARMY CORPS OF ENGINEERS, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 2:18-cv-00330-DCN |

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1.      This case arises from the defendant agencies' unprecedented and unlawful actions in removing crucial protections from the nation's waters, including streams, marshes, and bays across South Carolina and near this honorable Court. The actions challenged in this case have violated fundamental provisions of administrative law and furthered a campaign to diminish and impair the protections of the Clean Water Act—a bedrock federal statute that protects America's waters from pollution.

2.     The very first sentence of the Clean Water Act states the law's unequivocal purpose: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Pub. L. No. 92-500, § 101(a), 86 Stat. 816 (1972) (codified at 33 U.S.C. § 1251(a)). While the Clean Water Act established a number of programs aimed at achieving this objective, they are all rooted in a single prohibition. Under the statute, no one is allowed to discharge pollutants into the "waters of the United States" without a permit. 33 U.S.C. §§ 1311(a), 1362(12) (prohibiting the unpermitted "discharge of any pollutant" into "navigable waters"); id. § 1362(7) (defining "navigable waters" as "the waters of the United States").

3.     For more than forty years, the meaning of "waters of the United States"—and the resulting reach of the Clean Water Act—proved a persistent source of contention and confusion. While the Supreme Court repeatedly affirmed that federal protections extend to wetlands and streams that are not "navigable in fact[,]" the regulatory line between "jurisdictional" and "non-jurisdictional" waters was often difficult to identify. See Rapanos v. United States, 547 U.S. 715, 730-31 (2006) (citing Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 167 (2001), and United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985)). As a result, the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers—the agencies charged with carrying out the Clean Water Act at the federal level, and defendants in this case—evaluated "the jurisdiction of waters on a case-specific basis far more frequently than [wa]s best for clear and efficient implementation of the CWA." Proposed Rule, Definition of "Waters of the U.S." under the Clean Water Act, 79 Fed. Reg. 22,188 (Apr. 21, 2014). The agencies' uneven, case-by-case approach also deprived many waters of the protections they were owed under the Clean Water Act.

4.      The Clean Water Rule, which was finalized by the agencies in 2015, remedied both of these problems by setting forth clearer lines that "ensure protection for the nation's public health and aquatic resources, and increase CWA program predictability and consistency by clarifying the scope of 'waters of the United States' protected under the Act." Final Rule, Clean Water Rule: Definition of "Waters of the U.S.," 80 Fed. Reg. 37,054 (June 29, 2015) ("Clean Water Rule"). The regulation confirmed that the protective reach of the Clean Water Act extends to wetlands and tributaries "that require protection in order to restore and maintain the chemical, physical, or biological integrity of traditional navigable waters[.]" Id. at 37,055. At the same time, it "clarif[ied] and simplif[ied]" the implementation of the statute "through clearer definitions and increased use of bright-line boundaries to establish waters that are jurisdictional by rule"—"limit[ing] the need for case-specific analysis." Id. In establishing these definitions and boundaries, the agencies were "guided by the best available peer-reviewed science" and "over 1 million public comments … , the substantial majority of which supported the [agencies'] proposed rule[.]" Id. at 37,057.

5.      This case challenges the new administration's arbitrary and unlawful attempt to suspend the protections of the Clean Water Rule under the pretext of "regulatory certainty[.]" Final Rule, Definition of "Waters of the U.S."—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018) ("Suspension Rule"). The challenged regulation is a result of EPA Administrator Scott Pruitt's multi-year campaign to eradicate the Clean Water Rule—a campaign that began when Mr. Pruitt was the Attorney General of Oklahoma. As shown below, the manner in which Administrator Pruitt has attempted to suspend the regulation—in essence, by executive fiat—betrays an extraordinary disregard for federal rulemaking requirements and the views of the American public.

6.      The rulemaking process challenged in this case originated with Executive Order 13,778, 82 Fed. Reg. 12,497 (Feb. 28, 2017). In response to the order, the agencies first published a proposed "interim" regulation intended to repeal the Clean Water Rule before the agencies had developed a replacement, which they promised to do following a "substantive review of the appropriate scope of 'waters of the United States.'" Proposed Rule, Definition of "Waters of the U.S."—Recodification of Pre-Existing Rules, 82 Fed. Reg. 34,899, 34,901 (July 27, 2017) ("Proposed Repeal Rule"). After receiving more than 680,000 comments on their proposed repeal, however, the agencies changed course and announced a new proposal to retroactively "amend the effective date of the … Clean Water Rule[,]" rendering it ineffective for at least two years. Proposed Rule, Definition of "Waters of the U.S."—Amendment of Effective Date of 2015 Clean Water Rule (Nov. 16, 2017) (prepublication version) ("Effective-Date Proposal"), at 1, 9 (attached as Ex. 1). When this proposal was published in the Federal Register, it had been changed without explanation; rather than altering an "effective date" that had already passed, the regulation sought to "add an applicability date" to the Clean Water Rule. Proposed Rule, Definition of "Waters of the U.S."—Addition of an Applicability Date to 2015 Clean Water Rule, 82 Fed. Reg. 55,542 (Nov. 22, 2017) ("Proposed Suspension Rule"). According to the agencies, the proposed "applicability date" would suspend the Clean Water Rule's protections for two years, ensuring that the EPA and the Corps would have "sufficient time" to undertake the "regulatory process for reconsidering the definition of 'waters of the United States[.]'" Id. at 55,544.

7.      The Clean Water Rule resulted from a four-year process of outreach and analysis that considered "over 1 million public comments … , as well as input provided through … over 400 meetings nationwide with states, small businesses, farmers, academics, miners, energy

companies, counties, municipalities, environmental organizations, other federal agencies, and many others." Clean Water Rule, 80 Fed. Reg. at 37,057. By contrast, in proposing to suspend the Clean Water Rule's protections, the agencies affirmatively refused to "engage in substantive re-evaluation of the definition of 'waters of the United States[.]'" Proposed Suspension Rule, 82 Fed. Reg. at 55,545. Indeed, the EPA and the Corps instructed the public to do the same, declaring that they would not "solicit[] comment on the specific content" of the Clean Water Rule, which the suspension rule set aside, or on the agencies' prior regulations and guidance, which the suspension rule sought to revive. Id.

8.      The agencies' suspension rule, proposed and adopted in gross violation of the Administrative Procedure Act, is both arbitrary and unlawful. This Court should accordingly set the regulation aside to protect the integrity of the nation's waters and the rule of law.

### JURISDICTION AND VENUE

9.      This action is brought pursuant to the judicial-review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-06, which waive the defendants' sovereign immunity. This Court has jurisdiction over the plaintiffs' claims under 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201 and 2202. See Nat'l Ass'n of Mfrs. v. Dep't of Def., No. 16-299, 2018 WL 491526, at *4 (U.S. Jan. 22, 2018).

10.     Venue is proper in this District and Division under 28 U.S.C. § 1391(e)(1) and Local Civ. Rule 3.01(A) (D.S.C.) because the South Carolina Coastal Conservation League and Charleston Waterkeeper, two of the plaintiffs in this action, reside within the District and the Charleston Division, and the U.S. Army Corps of Engineers also carries out its South Carolina operations from the agency's Charleston District offices.

## PLAINTIFFS

11.     The plaintiff organizations in this case, along with their members, are committed to protecting "the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

12.     Plaintiff South Carolina Coastal Conservation League is a nonprofit organization incorporated under the laws of South Carolina. The League maintains its headquarters office in Charleston, South Carolina, and currently has approximately 5,000 members. Its mission is to protect the natural environment of South Carolina's coastal plain, and to enhance the quality of life in the state's communities by working with individuals, businesses, and government to ensure balanced solutions to environmental problems. Protecting wetlands and aquatic habitat in the Lowcountry of South Carolina has been an important goal of the League's since it was first established in 1989.

13.     Plaintiff Charleston Waterkeeper is a Charleston, South Carolina based organization whose mission is to protect, promote, and restore the quality of Charleston's waterways while creating a more engaged public through education, outreach, and celebration of our collective right to clean water. As a result of its focus on water-quality issues in the Charleston Harbor Watershed, which includes both the Ashley and Cooper river basins, Charleston Waterkeeper operates on the front lines, working with the community to patrol and monitor the region's waterways. The organization relies on strict empirical evidence to identify water-quality issues and reach pragmatic solutions. Charleston Waterkeeper's goal is to protect the public's right under the Clean Water Act to clean, swimmable, fishable, and enjoyable water.

14.     Plaintiff American Rivers works to protect wild rivers, restore damaged rivers, and conserve clean water for people and nature. Since 1973, American Rivers has protected and

restored more than 150,000 miles of rivers through educational and advocacy efforts, on-the-ground projects, and an annual America's Most Endangered Rivers campaign. Headquartered in Washington, D.C., American Rivers has offices across the country—including two in South Carolina—and more than 275,000 members, supporters, and volunteers.

15.     Plaintiff Chattahoochee Riverkeeper is dedicated to securing the protection and stewardship of the Chattahoochee River watershed—including its lakes, tributaries, and wetlands—in order to restore and conserve the watershed's ecological health for the people and wildlife that depend upon it. Based in Gainesville, Georgia, Chattahoochee Riverkeeper is an advocacy organization with more than 7,200 members committed to protecting and restoring the Chattahoochee River Basin—a drinking-water source for nearly four million people in Georgia, Alabama, and Florida. From the north Georgia mountains to the Florida border, the Chattahoochee River is impacted by unplanned development; storm runoff and trash from roads, construction sites, and industries; and discharges from sewage-treatment plants. While significant improvements have been made in the river, much remains to be accomplished. Chattahoochee Riverkeeper uses advocacy, education, research, communication, cooperation, monitoring, and legal actions to protect and preserve the Chattahoochee and its watershed.

16.     Plaintiff Clean Water Action is a national, non-profit membership organization incorporated under the laws of the District of Columbia, with its principal place of business in Washington, D.C. Clean Water Action conducts campaigns on the national level, as well as state and local campaigns in over a dozen offices around the country. Clean Water Action's mission includes the prevention of pollution in the nation's waters, the protection of natural resources, the creation of environmentally safe jobs and businesses, and the empowerment of people to make democracy work. Its activities include policy research and advocacy, public education, and

grassroots mobilization. Clean Water Action has been involved with the Clean Water Act since its founding in 1972, and has also been involved in implementation activities throughout its history. Clean Water Action's core programs have always included efforts to ensure broad jurisdiction under the Clean Water Act to include wetlands and streams, as well as efforts to strengthen the Act's implementation and enforcement and to work toward the Act's goal of zero discharge of pollution into the waters of the United States. Since 2002, advocating to ensure that wetlands, streams, and other vital water resources are protected by the Clean Water Act's pollution-prevention programs has been a priority campaign for Clean Water Action.

17.     Plaintiff Defenders of Wildlife is dedicated to protecting the nation's native plants and wildlife and the habitats upon which they depend. Founded in 1947, Defenders has more than a million members and supporters nationwide, over 4,500 of whom live in South Carolina. Defenders works to protect and restore the fragile aquatic habitats that freshwater and marine species require to survive. Defenders' commitment to science-based policies informs its conservation work at the local, state, and national levels. Defenders focuses on the conservation of threatened and endangered species and on preventing other species from becoming similarly imperiled.

18.     Plaintiff Friends of the Rappahannock was founded in 1985 as a non-profit, grassroots conservation organization based in Fredericksburg, Virginia. It works at the local, state, and federal levels to ensure the maximum protections for the Rappahannock River, which flows from the Blue Ridge Mountains to the Chesapeake Bay.

19.     Plaintiff North Carolina Coastal Federation is a member-supported organization that focuses on protecting and restoring the North Carolina coast. For 35 years, the Coastal Federation has been in the field restoring miles of coastline; training and educating students,

adults, and communities to take actions that result in cleaner coastal waters; and advocating for an accessible, healthy, and productive coast.

20.     Plaintiff North Carolina Wildlife Federation has worked for all wildlife and wildlife habitat since 1945, bringing together citizens, outdoor enthusiasts, hunters and anglers, government, and industry to protect North Carolina's natural resources. From the Great Smoky Mountains to the Outer Banks, the Wildlife Federation is made up of people who value wildlife and wild places, and the many ways to enjoy them. Through its policy and protection work, research and education, and direct hands-on conservation projects, the Federation works collectively for the places and species that have no voice. Water conservation is a critical part of the Federation's efforts.

21.     If the defendant agencies' unlawful suspension of the Clean Water Rule is allowed to stand, the plaintiff organizations and their members will be irreparably injured.

22.     First, the challenged regulation strips Clean Water Act protections from wetlands and streams across the country, allowing them to be degraded and destroyed. See, e.g., U.S. EPA and Dep't of the Army, Economic Analysis for the Proposed Definition of "Waters of the U.S."—Recodification of Pre-existing Rules (June 2017) ("Economic Analysis"), at 2 (acknowledging that the elimination of the Clean Water Rule's protections would "result[] in an overall reduction in positive jurisdictional determinations" under the Clean Water Act), available at https://www.epa.gov/sites/production/files/2017-06/documents/economic_analysis_proposed_step1_rule.pdf (last visited Feb. 1, 2018), and https://perma.cc/429A-KMUX (permanent link). These impacts will be particularly pronounced along the Southeastern coastal plain, which is marked by two types of wetlands that were granted additional protections under the Clean Water Rule—Carolina Bays and pocosins. See, e.g., Clean Water Rule, 80 Fed. Reg. at 37,071-73.

23.     Because the plaintiff conservation groups and their members have significant, particularized, and concrete interests in maintaining the integrity of Carolina Bays, pocosins, and similar waters, they will be injured by the challenged suspension. Unless the regulation is vacated, the recreational use and enjoyment of wetlands and streams by the groups' members will be significantly impaired. The groups and their members will also be burdened by legitimate concerns about the future loss of wetlands and streams as a result of the Clean Water Rule's suspension.

24.     Second, in stripping Clean Water Act protections from wetlands and streams, the challenged regulation will also harm the nation's downstream waters. As the defendant agencies acknowledged in adopting the Clean Water Rule, both "[p]eer-reviewed science and practical experience demonstrate that upstream waters, including headwaters and wetlands, significantly affect the chemical, physical, and biological integrity of downstream waters by playing a crucial role in controlling sediment, filtering pollutants, reducing flooding, providing habitat for fish and other aquatic wildlife, and many other vital chemical, physical, and biological processes." Clean Water Rule, 80 Fed. Reg. at 37,055. By limiting the extent of upstream protections, in other words, the suspension rule will harm the integrity of "traditional navigable waters," "the territorial seas[,]" and other downstream waters. Id.

25.     Because the plaintiff conservation groups and their members have substantial interests in the integrity of downstream waters, they will be injured by the challenged regulation. The quality of the nation's waters is of fundamental importance to each of the groups. The groups' members, moreover, use and rely on downstream waters for recreation, drinking water, and other needs. The suspension of the Clean Water Rule's protections will irreparably harm these interests.

26.     Finally, in unlawfully narrowing the reach of the Clean Water Act, the challenged regulation will require the plaintiff groups and their members to advocate for local water-quality protections before a multitude of agencies in jurisdictions across the United States. This jurisdiction-by-jurisdiction fight for protections that are owed to upstream waters under federal law will be extremely resource intensive and would divert resources from the groups' other programs and activities.

**DEFENDANTS**

27.     Defendant E. Scott Pruitt, who signed the challenged regulation, is sued in his official capacity as the Administrator of the U.S. Environmental Protection Agency. Mr. Pruitt's efforts to eliminate the protections of the Clean Water Rule, however, began more than two years ago, while he was serving as the Attorney General of Oklahoma.

28.     Defendant United States Environmental Protection Agency is the federal agency responsible for implementing most of the Clean Water Act's provisions. Despite its recent turn toward eliminating essential environmental protections, the EPA was established with the "mission" of "protect[ing] human health and the environment." U.S. EPA, Our Mission and What We Do, available at https://www.epa.gov/aboutepa/our-mission-and-what-we-do (last visited Feb. 1, 2018), and https://perma.cc/M23S-MUUC (permanent link); see also Reorganization Plan No. 3 of 1970, 3 C.F.R. § 1072 (1970), reprinted in 5 U.S.C. app., at 214, 217 (2016) (providing that the first of the EPA's "principal roles and functions" is "[t]he establishment and enforcement of environmental protection standards consistent with national environmental goals"). Consistent with this mission, the primary "purpose[s]" of the agency are to ensure:

> that … all Americans are protected from significant risks to human
> health and the environment where they live, learn and work; …

11

> [that] national efforts to reduce environmental risk are based on the best available scientific information; … [and that] federal laws protecting human health and the environment are enforced fairly and effectively[.]

U.S. EPA, Our Mission and What We Do.

29.     Defendant Ryan Fisher is sued in his official capacity as Acting Assistant Secretary of the Army (Civil Works). Mr. Fisher signed the challenged rule on behalf of the U.S. Army Corps of Engineers.

30.     Defendant United States Army Corps of Engineers is a federal agency housed within the U.S. Army, which is part of the U.S. Department of Defense. Under the Clean Water Act, the Corps is responsible for regulating the discharge of dredged and fill material into the waters of the United States. 33 U.S.C. § 1344(a).

## BACKGROUND

31.     By the early 1970s, the nation's water-quality crisis could no longer be denied. As the House Committee on Public Works concluded in 1972, "America's waters [we]re in serious trouble, thanks to years of neglect, ignorance and public indifference." H.R. Rep. No. 92-911, at 1 (1972). "Many of the Nation's navigable waters [we]re severely polluted[,]" "major waterways near the industrial and urban areas [we]re unfit for most purposes[,]" and "many lakes and confined waterways [we]re aging rapidly under the impact of increased pollution[.]" S. Rep. No. 92-414, at 7 (1971). "Rivers, lakes, and streams [we]re being used[,]" in short, "to dispose of man's wastes rather than to support man's life and health[.]" Id.

32.     The state of the nation's waters was all the more troubling given the history of congressional efforts to address water pollution. More than twenty years before, Congress had adopted the Federal Water Pollution Control Act of 1948. See H.R. Rep. No. 92-911, at 1; Pub. L. No. 80-845, 62 Stat. 1155 (1948). Other statutes followed, including the Federal Water

Pollution Control Act of 1956, Pub. L. No. 84-660, 70 Stat. 498 (1956); the Water Quality Act of

1965, Pub. L. No. 89-234, 79 Stat. 903 (1965); the Clean Water Restoration Act of 1966, Pub. L.

No. 89-753, 80 Stat. 1246 (1966); and the Water Quality Improvement Act of 1970, Pub. L. No.

91-224, 84 Stat. 91 (1970). All of this legislation, however, limited "the Federal role … to

support of, and assistance to, the States[,]" which were charged with "lead[ing] the national

effort to prevent, control and abate water pollution." S. Rep. No. 92-414, at 1. This approach

failed. After assessing the condition of the nation's waters during a series of hearings in 1970

and 1971, the Senate Committee on Public Works was forced to conclude that "the national

effort to abate and control water pollution ha[d] been inadequate in every vital aspect[.]" Id. at 7.

## I.     The Clean Water Act and the "Waters of the United States"

33.     With the passage of the Clean Water Act in 1972, Congress fundamentally

transformed the nation's water-quality program. Unlike previous federal statutes, the Clean

Water Act was enacted to achieve an unequivocal objective: "restor[ing] and maintain[ing] the

chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "This

objective[,]" the Supreme Court later affirmed,

> incorporated a broad, systemic view of the goal of maintaining and
> improving water quality: as the House Report on the legislation put
> it, "the word 'integrity' … refers to a condition in which the
> natural structure and function of ecosystems … [are] maintained."
> H.R. Rep. No. 92-911, p. 76 (1972). Protection of aquatic
> ecosystems, Congress recognized, demanded broad federal
> authority to control pollution, for "[w]ater moves in hydrologic
> cycles and it is essential that discharge of pollutants be controlled
> at the source." S. Rep. No. 92-414, p. 77 (1972)[.]

Riverside Bayview Homes, 474 U.S. at 132-33.

34.     The Clean Water Act established this "broad federal authority" by "defin[ing] the

waters covered by the Act broadly." Riverside Bayview Homes, 474 U.S. at 133. Under the

statute, the discharge of pollutants into "navigable waters" is prohibited in the absence of a permit issued by the EPA, the Corps, or an authorized state—a system known as cooperative federalism. 33 U.S.C. §§ 1311(a), 1342, 1344, 1362(12). Historically, the term "navigable waters" was interpreted to include only those waters that are "navigable in fact"—that is, "used, or … susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." The Daniel Ball, 77 U.S. 557, 563 (1870). With the Clean Water Act, however, Congress expanded the phrase "navigable waters" to include "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). "In adopting this definition of 'navigable waters,'" the Supreme Court has said, "Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." Riverside Bayview Homes, 474 U.S. at 133.

## II.    The Supreme Court and the "Waters of the United States"

35.    In the decades since the enactment of the Clean Water Act, the meaning of the phrase "waters of the United States" has been addressed on three occasions by the United States Supreme Court.

36.    The Court first considered the scope of the Clean Water Act's protections in United States v. Riverside Bayview Homes—a case concerning "80 acres of low-lying, marshy land near the shores of Lake St. Clair in Macomb County, Michigan." 474 U.S. at 124. Citing a 1975 regulation that included "all wetlands adjacent to navigable or interstate waters and their tributaries" within "the waters of the United States," the Army Corps of Engineers had sued to prevent the property's owner from filling it without a permit. Id. at 124, 129. The Supreme Court

unanimously affirmed the Corps' assertion of jurisdiction. According to the Court, "the evident breadth of congressional concern for protection of water quality and aquatic ecosystems suggest[ed] that it [wa]s reasonable for the Corps to interpret the term 'waters' to encompass wetlands adjacent to waters as more conventionally defined[;]" such wetlands, as the Corps had previously determined, "play a key role in protecting and enhancing water quality[.]" Id. at 133. Given "the breadth of federal regulatory authority contemplated by the [Clean Water] Act itself and the inherent difficulties of defining precise bounds to regulable waters," the Court concluded that "the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provide[d] an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act." Id. at 134.

37.    The Supreme Court returned to "the waters of the United States" in Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers, which centered on "an abandoned sand and gravel pit in northern Illinois … [that] provide[d] habitat for migratory birds." 531 U.S. at 162. In a 1986 Federal Register publication, the Corps had announced that its Clean Water Act authority extended to "intrastate waters … '[w]hich are or would be used as habitat by birds protected by Migratory Bird Treaties … [or] other migratory birds which cross state lines[.]'" Id. at 164 (quoting 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986)). The Supreme Court disagreed. While reiterating that "Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands 'inseparably bound up with the "waters" of the United States[,]'" a five-justice majority concluded that the Clean Water Act was not meant to apply to an isolated pit where the only grounds for jurisdiction under the statute was the pit's use "as habitat for migratory birds." Id. at 167, 171-72, 174.

38.     The Supreme Court's most recent—and most fractured—decision regarding "the waters of the United States" was issued nearly twelve years ago in <u>Rapanos v. United States</u>, 547 U.S. at 715. The case raised the question of whether the Clean Water Act's protections could be extended to wetlands that "are not adjacent to waters that are navigable in fact." <u>Id.</u> at 759 (Kennedy, J., concurring). As Chief Justice Roberts noted in a brief concurrence that emphasized the need for clarification through agency rulemaking, "no opinion command[ed] a majority of the Court on precisely how to read Congress' limits on the reach of the Clean Water Act." <u>Id.</u> at 758.

39.     In an opinion joined by three other members of the Court, Justice Scalia acknowledged that "the meaning of 'navigable waters' in the Act is broader than the traditional understanding of that term[.]" <u>Rapanos</u>, 547 U.S. at 731. He argued, however, that the statute's protections only reached wetlands with "a continuous surface connection" to "relatively permanent, standing or continuously flowing bodies of water[.]" <u>Id.</u> at 739, 742.

40.     Justice Scalia's narrow reading of the Clean Water Act was rejected by five members of the Court. In a concurring opinion, Justice Kennedy explained that the limits imposed by Justice Scalia's standard would give "insufficient deference to Congress' purposes in enacting the Clean Water Act and to the authority of the Executive to implement that statutory mandate." <u>Rapanos</u>, 547 U.S. at 777-78. According to Justice Kennedy, "a water or wetland" must instead be given federal protections whenever it "possess[es] a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." <u>Id.</u> at 759 (quoting <u>Solid Waste Agency of N. Cook Cty.</u>, 531 U.S. at 167, 172). "[W]etlands possess the requisite nexus, and thus come within the statutory phrase 'navigable waters,'" he concluded, "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the

chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Id. at 780.

41.     The Court's four remaining justices declared in a dissent that they would affirm an assertion of federal jurisdiction "in all … cases in which either the [Scalia or Kennedy] … test is satisfied[.]" Rapanos, 547 U.S. at 810 n.14 (Stevens, J., dissenting). As a result, Justice Kennedy's "significant nexus" standard effectively prevailed in Rapanos, confirming that the protections of the Clean Water Act reach beyond wetlands with "a continuous surface connection" to "relatively permanent, standing or continuously flowing bodies of water[.]" Id. at 739, 742, 759.

42.     In 2008, the Environmental Protection Agency and the Army Corps of Engineers issued a guidance memorandum aimed at "ensur[ing] that jurisdictional determinations, administrative enforcement actions, and other relevant agency actions [we]re consistent with the Rapanos decision[.]" See Clean Water Act Jurisdiction following the U.S. Supreme Court's Decision in Rapanos v. United States (Dec. 2, 2008), at 4 ("2008 Guidance"), available at https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_ following_rapanos120208.pdf (last visited Feb. 1, 2018), and https://perma.cc/56W8-KNXJ (permanent link). The guidance was never codified or subjected to judicial review; as explained below, it was also contrary to Supreme Court precedent.

43.     In identifying the "waters over which the agencies w[ould] assert jurisdiction categorically and on a case-by-case basis," the 2008 guidance interpreted Justice Kennedy's "significant nexus" test as allowing the agencies to ignore the collective importance of many similarly situated waters, 2008 Guidance at 4, 8-12, despite Justice Kennedy's conclusion that the Clean Water Act protects wetlands and other upstream waters with a collectively significant

impact on downstream waters, Rapanos, 547 U.S. at 780-81. With respect to wetlands, in

particular, Justice Kennedy had noted that "the requisite nexus" can be found whenever the

wetland at issue "significantly affect[s] the chemical, physical, and biological integrity" of a

navigable-in-fact water "either alone or in combination with similarly situated lands in the

region[.]" Id. at 780. "Where an adequate nexus is established for a particular wetland," he

added, "it may be permissible, as a matter of administrative convenience or necessity, to presume

covered status for other comparable wetlands in the region." Id. at 782. As a number of the

plaintiff conservation groups noted in their comments on the Rapanos guidance,

> [t]he natural reading of these passages is that EPA and the Corps,
> using their expert judgment, can evaluate available information
> about specific wetlands, establish that a "significant nexus" is
> present, and then notify the regulated community and the public
> that wetlands of the same type over a specified geographic area
> will be considered protected waters. The agencies also can make
> … similar jurisdictional judgments about wetlands adjacent to
> categories of tributaries which are important enough … that the
> adjacent wetlands will likely have a significant water quality effect
> (physical, chemical, or biological) on downstream traditionally
> navigable waters.

American Rivers, et al., Comments on the Joint Guidance Regarding Clean Water Act

Jurisdiction After Rapanos (EPA-HQ-OW-2007-0282) (Jan. 21, 2008), at 21, available at

https://www.regulations.gov/contentStreamer?documentId=EPA-HQ-OW-2007-0282-

0227&attachmentNumber=2&contentType=pdf (last visited Feb. 1, 2018), and https://

perma.cc/R5T3-H9QT (permanent link).

44.    Rather than establishing a mechanism for making categorical determinations

regarding the collective significance of wetlands in a given area, however, the agencies' 2008

memorandum largely relied on a narrow, "case-by-case" approach. 2008 Guidance at 4. Most

notably, the guidance eliminated the required evaluation of all "similarly situated [wet]lands in

the region," Rapanos, 547 U.S. at 780 (Kennedy, J., concurring) (emphasis added), replacing it with a more limited analysis of "all wetlands adjacent to the same tributary[,]" 2008 Guidance at 10 (emphasis added). Under this scheme, as the agencies have acknowledged, "almost all waters and wetlands across the country [were] theoretically … subject to a case-specific jurisdictional determination[,]" which "result[ed] in inconsistent interpretation of CWA jurisdiction and perpetuate[d] ambiguity over where the CWA applies. " Clean Water Rule, 80 Fed. Reg. at 37,056.

## III.    The Clean Water Rule

45.    Given the significant shortcomings of their prior regulations and guidance, the EPA and the Corps promulgated the Clean Water Rule to "ensure protection for the nation's public health and aquatic resources, and increase CWA program predictability and consistency by clarifying the scope of 'waters of the United States' protected under the Act." Clean Water Rule, 80 Fed. Reg. at 37,054. In developing the regulation, the agencies reviewed and relied on the "best available peer-reviewed science[,]" the decisions of the Supreme Court, and the clear "objective" of the Clean Water Act. See id. at 37,056, 37,057. Ultimately, the agencies rested their interpretation of the statute on Justice Kennedy's "significant nexus" standard. Id. at 37,060. Under the rule, "[w]aters are 'waters of the United States' if they, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas." Id.

46.    To answer the question of which waters satisfied the "significant nexus" standard, the agencies undertook more than four years of research, analysis, and public outreach. See U.S. EPA Office of Research and Dev., Connectivity of Streams and Wetlands to Downstream

Waters: A Review and Synthesis of the Scientific Evidence (Jan. 2015) ("Science Report"), at

xii, <u>available at</u> http://ofmpub.epa.gov/eims/eimscomm.getfile?p_download_id=

523020 (last visited Feb. 1, 2018), <u>and</u> https://perma.cc/5KDU-HP4W (permanent link).

47.    In 2015, the EPA's Office of Research and Development published the results of

a comprehensive inquiry into the chemical, physical, and biological connections between

upstream and downstream waters. Science Report at ES-1. After synthesizing more than 1,200

peer-reviewed studies, the agency's report reached a series of "major conclusions" that would

serve as the foundation of the Clean Water Rule. <u>Id.</u> at ES-2. First, the report confirmed that

"streams, individually or cumulatively, exert a strong influence on the integrity of downstream

waters." <u>Id.</u>; <u>see</u> Clean Water Rule, 80 Fed. Reg. at 37,057, 37,063 (summarizing report). "All

tributary streams," the agency declared, "including perennial, intermittent, and ephemeral

streams, are physically, chemically, and biologically connected to downstream rivers via

channels and associated alluvial deposits where water and other materials are concentrated,

mixed, transformed, and transported." Science Report at ES-2. Second, in addressing "wetlands

and open waters in riparian areas and floodplains[,]" the report determined that they "are

physically, chemically, and biologically integrated with rivers via functions that improve

downstream water quality, including the temporary storage and deposition of channel-forming

sediment and woody debris, temporary storage of local ground water that supports baseflow in

rivers, and transformation and transport of stored organic matter." <u>Id.</u> at ES-2–ES-3; <u>see</u> Clean

Water Rule, 80 Fed. Reg. at 37,057, 37,063 (summarizing report). Finally, while noting that

"[w]etlands and open waters in non-floodplain landscape settings … provide numerous functions

that benefit downstream water integrity"—including "storage of floodwater; recharge of ground

water that sustains river baseflow; retention and transformation of nutrients, metals, and

pesticides; export of organisms or reproductive propagules to downstream waters; and habitats needed for stream species"—the report concluded that evaluation "of the degree of connectivity for specific groups or classes of wetlands (e.g., prairie potholes or vernal pools)" required "case-by-case analysis." Science Report at ES-3–ES-4; see also Clean Water Rule, 80 Fed. Reg. at 37,057, 37,063 (summarizing report).

48.    With the Clean Water Rule, the EPA and the Corps translated this science into clear regulatory standards that are "easier to understand, consistent, and environmentally more protective" than the agencies' prior regulations and guidance. Clean Water Rule, 80 Fed. Reg. at 37,057. The regulation, which became effective on August 28, 2015, organizes the nation's waters into three classes: "[w]aters that are jurisdictional in all instances, waters that are excluded from jurisdiction, and a narrow category of waters subject to case-specific analysis to determine whether they are jurisdictional." Id.

49.    The class of waters deemed "jurisdictional in all instances" is centered around traditional navigable waters, interstate waters, and the territorial seas, along with "impoundments" of such waterbodies. Clean Water Rule, 80 Fed. Reg. at 37,057-58; see also 33 C.F.R. § 328.3(a)(1)-(4). To this list of waters, the Clean Water Rule adds both "tributaries" that have "a bed and banks and an ordinary high water mark[,]" and "waters adjacent" to other jurisdictional waters, "including wetlands, ponds, lakes, oxbows, impoundments, and similar waters[.]" 33 C.F.R. § 328.3(a)(5)-(6), (c)(3). According to the agencies, "[t]he great majority of tributaries as defined by the rule are headwater streams that play an important role in the transport of water, sediments, organic matter, nutrients, and organisms to downstream waters." Clean Water Rule, 80 Fed. Reg. at 37,058. As to "adjacent waters," the regulation uses "bright line boundaries" to target only "those waters that … possess the requisite connection to

downstream waters and function as a system to protect the chemical, physical, or biological integrity of those waters." Id.; see also 33 C.F.R. § 328.3(c)(1)-(2) (defining "adjacent" to include "[a]ll waters located within 100 feet of the ordinary high water mark" of another jurisdictional water; "[a]ll waters located within the 100-year floodplain of … [another jurisdictional] water … and not more than 1,500 feet from the ordinary high water mark of such water[;]" "[a]ll waters located within 1,500 feet of the high tide line of … [another jurisdictional] water[;]" and "all waters within 1,500 feet of the ordinary high water mark of the Great Lakes").

50.    In delineating the "narrow category of waters subject to case-specific analysis" under the Clean Water Rule, the EPA and the Corps specifically "identified … five specific types of waters in specific regions that science demonstrates should be subject to a significant nexus analysis and are considered similarly situated by rule because they function alike and are sufficiently close to function together in affecting downstream waters." Clean Water Rule, 80 Fed. Reg. at 37,057, 37,059. "Consistent with Justice Kennedy's opinion in Rapanos, the agencies determined that … [these] waters"—"Prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, and Texas coastal prairie wetlands"—"should be analyzed 'in combination' (as a group, rather than individually) in the watershed that drains to the nearest traditional navigable water, interstate water, or the territorial seas when making a case-specific analysis of whether these waters have a significant nexus" to such downstream waters. Id. at 37,059; 33 C.F.R. § 328.3(a)(7). By providing for watershed-wide assessments of "similarly situated" waters, 33 C.F.R. § 328.3(a)(7), the Clean Water Rule eliminated the 2008 guidance's narrow and unlawful focus on waters "adjacent to the same tributary[,]" 2008 Guidance at 10.

51.    The final category of waters—those expressly "excluded from jurisdiction"—is expanded under the Clean Water Rule. Clean Water Rule, 80 Fed. Reg. at 37,057, 37,059. According to the agencies, "[p]rior converted cropland and waste treatment systems ha[d] been excluded from the definition of 'waters of the United States' … since 1992 and 1979 respectively, and continue[d] to be excluded" by the new regulation. Id. at 37,059; 33 C.F.R. § 328.3(b)(1)-(2). The rule established additional exclusions for a variety of ditches and artificial waters, as well as "erosional features[.]" Clean Water Rule, 80 Fed. Reg. at 37,059; 33 C.F.R. § 328.3(b)(3)-(4). While the agencies had "never considered puddles to meet the minimum standard for being a 'water of the United States,'" they also honored the request of "numerous commenters" who had asked for an express puddle exclusion. Clean Water Rule, 80 Fed. Reg. at 37,099; 33 C.F.R. § 328.3(b)(4)(vii).

52.    The Clean Water Rule's puddle provision was emblematic of the agencies' considerable efforts to solicit and address public comments. After publishing the proposed rule in April 2014, the EPA and the Corps invited members of the public to submit substantive comments for more than 200 days. Clean Water Rule, 80 Fed. Reg. at 37,057; Extension of Comment Period for the Definition of "Waters of the U.S." under the Clean Water Act Proposed Rule and Notice of Availability, 79 Fed. Reg. 61,590, 61,590-91 (Oct. 14, 2014) (extending the comment period on the agencies' proposal until November 14, 2014). The agencies' final regulation:

> reflect[ed] the over 1 million public comments on the proposal, the substantial majority of which supported the proposed rule, as well as input provided through the agencies' extensive public outreach effort, which included over 400 meetings nationwide with states, small businesses, farmers, academics, miners, energy companies, counties, municipalities, environmental organizations, other federal agencies, and many others.

Clean Water Rule, 80 Fed. Reg. at 37,057.

53.    The opportunity for public comment was not limited to the rulemaking process. Following the preparation of its draft report on "the effects that small streams, wetlands, and open waters have on larger downstream waters[,]" the EPA asked the public to assist the Science Advisory Board in its "comprehensive technical review" of the document. Request for Nominations of Experts for a Science Advisory Bd. Panel to Review EPA's Draft Science Synthesis Report on the Connectivity of Streams and Wetlands to Downstream Waters, 78 Fed. Reg. 15,012 (Mar. 8, 2013); Clean Water Rule, 80 Fed. Reg. at 37,057. In early 2013, the agency encouraged members of the public to nominate "recognized experts" in hydrology, ecology, and other disciplines for the Board's review panel. 78 Fed. Reg. at 15,012. After the panel had been selected, the public was repeatedly invited to submit comments and attend hearings. Clean Water Rule, 80 Fed. Reg. at 37,062. All told, "[o]ver 133,000 public comments were received" by the panel, and "[e]very meeting [it held] was open to the public, noticed in the Federal Register, and had time allotted for the public to present their views." Id.

54.    The Clean Water Rule, in short, was the product of extensive public outreach and thorough scientific analysis. In seeking to eliminate the regulation's protections, the new administration took a decidedly different approach.

**IV.    The Trump Administration's Efforts to Eliminate the Clean Water Rule**

55.    The Trump Administration's plans for the Clean Water Rule became clear before Inauguration Day. On December 8, 2016, the President-elect announced that he would nominate E. Scott Pruitt, the Attorney General of Oklahoma, to serve as the Administrator of the U.S. Environmental Protection Agency. See Press Release (Dec. 8, 2016), available at http://www.presidency.ucsb.edu/ws/index.php?pid=119781 (last visited Feb. 1, 2018), and https://

perma.cc/24UR-CSKM (permanent link). At the time of the announcement, Mr. Pruitt had been

waging an assault on the Clean Water Rule for more than two years.

56.     Attorney General Pruitt declared his opposition to the proposed Clean Water Rule

in 2014, when he joined a comment letter calling for its withdrawal. Comments of the Attorneys

Gen. of West Virginia, et al., on the Proposed Definition of "Waters of the U.S." (Docket No.

EPA-HQ-OW-2011-0880) (Oct. 8, 2014), available at https://www.regulations.gov/

contentStreamer?documentId=EPA-HQ-OW-2011-0880-7988&attachmentNumber=1&

contentType=pdf (last visited Feb. 1, 2018), and https://perma.cc/CDD2-RXTC (permanent

link). In subsequent testimony before two congressional committees, Mr. Pruitt described the

proposed rule as "a naked power grab by the EPA" and "a classic case of overreach"—one

"flatly contrary to the will of Congress, who, with the passing of the Clean Water Act, decided

that it was the States who should plan the development and use of local land and water

resources." Impacts of the Proposed "Waters of the U.S." Rule on State and Local Gov'ts: Joint

Hearing before the Comm. on Transp. and Infrastructure, U.S. House of Representatives, and the

Comm. on Env't and Pub. Works, U.S. Senate, 114th Cong. 70 (2015) ("Pruitt Testimony"). He

went on to accuse his future agency of being "generally … unresponsive to concerns expressed

by States, local governments, and individual citizens," and complained that the EPA had engaged

in "a public relations campaign designed to sway opinion and rule America." Id. According to

Mr. Pruitt, the proposed Clean Water Rule was "unlawful and should be withdrawn." Id. at 71.

57.     When the Clean Water Rule was not withdrawn, Attorney General Pruitt sued.

See Compl. for Declaratory and Injunctive Relief, State of Okla. ex rel. E. Scott Pruitt v. U.S.

EPA, No. 15-CV-381-CVE-FHM (N.D. Okla. July 8, 2015). In responding to a consolidated set

of challenges by Mr. Pruitt and others, the United States Court of Appeals for the Sixth Circuit

entered an order temporarily staying the regulation on October 9, 2015, to "allow[] for a more deliberate determination whether th[e] exercise of Executive power, enabled by Congress and explicated by the Supreme Court, [wa]s proper under the dictates of federal law." <u>In re: Clean Water Rule</u>, 803 F.3d 804, 808 (6th Cir. 2015).

58.     The Trump Administration's efforts to eliminate the Clean Water Rule began less than two weeks after Mr. Pruitt's confirmation. On February 28, 2017, President Trump issued an executive order directing Administrator Pruitt and the Assistant Secretary of the Army for Civil Works to "review the … Clean Water Rule … for consistency with the [Administration's] policy … and publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with law." Exec. Order No. 13,778, § 2(a). Remarkably, the order also instructed "the Administrator and the Assistant Secretary … [to] consider interpreting the term 'navigable waters[]' … in a manner consistent with the opinion of Justice Antonin Scalia in <u>Rapanos</u>"—an opinion whose limitations had been rejected by a majority of the Supreme Court. <u>Id.</u> § 3.

### A.    The Proposed Repeal of the Clean Water Rule

59.     Though President Trump's order called for a "review" of the Clean Water Rule before any action was taken, Exec. Order No. 13,778, § 2(a), Administrator Pruitt decided to move more quickly. On July 27, 2017, the EPA and the Corps proposed an immediate repeal of the Clean Water Rule. Proposed Repeal Rule, 82 Fed. Reg. at 34,899. According to the agencies, the repeal would serve as "the first step in a comprehensive, two-step process intended to review and revise the definition of 'waters of the United States' consistent with the Executive Order signed on February 28, 2017[.]" <u>Id.</u> The proposed rule, the agencies explained,

> would rescind the 2015 Clean Water Rule and replace it with a
> recodification of the regulatory text that governed the legal regime

26

> prior to the 2015 Clean Water Rule and that the agencies [we]re
> currently implementing under the … [Sixth Circuit's] stay,
> informed by applicable guidance documents … , and consistent
> with the SWANCC and Rapanos Supreme Court decisions,
> applicable case law, and longstanding agency practice.

Id. at 34,901-02. The regulation would, in other words, convert the Court of Appeals' temporary

stay into a permanent repeal—and revive the agencies' unlawful 2008 guidance.

60.     While the EPA and the Corps admitted that the proposed repeal would "define the

scope of 'waters of the United States' that are protected under the Clean Water Act[,]" they

affirmatively refused to "undertake any substantive reconsideration" of the issue. Proposed

Repeal Rule, 82 Fed. Reg. at 34,900, 34,903. In attempting to defend their reliance on such an

arbitrary approach, the agencies repeatedly argued that repealing the Clean Water Rule would do

nothing at all, eliminating any need for informed deliberation. In the words of the agencies,

because the Clean Water Rule "ha[d] already been stayed by the Sixth Circuit," the proposed

repeal would "simply codify the legal status quo … [as] a temporary, interim measure pending

substantive rulemaking[.]" Id. at 34,903. In truth, however, the agencies' proposed rule was

designed to permanently remove the Clean Water Rule from the Code of Federal Regulations—a

significant, and intended, change to the "legal status quo." See id. at 34,899-900.

61.     In addition to disregarding and disavowing the substantive implications of the

proposed repeal, the agencies insisted that members of the public do the same. With their notice

of proposed rulemaking, the agencies declared that they:

> [we]re not at this time soliciting comment on the scope of the
> definition of 'waters of the United States' that the agencies should
> ultimately adopt in the second step of th[eir] two-step process, as
> the agencies w[ould] address all of those issues, including those
> related to the … [Clean Water Rule], in the second notice and
> comment rulemaking to adopt a revised definition of 'waters of the
> United States' in light of the February 28, 2017, Executive Order.

Proposed Repeal Rule, 82 Fed. Reg. at 34,903. Moreover, the agencies added, because they had

no intention of "undertak[ing] any substantive reconsideration of the pre-2015 … definition"

their proposal would revive, members of the public should withhold their comments on it, as

well. Id. In place of a meaningful opportunity for comment, the agencies invited members of the

public to submit their views on "whether it … [would be] desirable and appropriate to re-codify

in regulation the status quo as an interim first step pending a substantive rulemaking to

reconsider the definition of 'waters of the United States'" and, if so, how "best … to accomplish

it." Id.

### B.     The Suspension of the Clean Water Rule

62.     Despite their acknowledgment that "[t]he scope of CWA jurisdiction is an issue of

great national importance[,]" the EPA and the Corps seemed unprepared for the public's

response to the proposed repeal. Proposed Repeal Rule, 82 Fed. Reg. at 34,902. In a

memorandum published nearly two months after the close of the comment period, the agencies

reported that they had received "more than 680,000 public comments" on the repeal rule.

Memorandum for the Record, Rulemaking Process for Proposed Rule: Definition of "Waters of

the U.S."—Addition of an Applicability Date to 2015 Clean Water Rule (Nov. 20, 2017)

("Rulemaking Memorandum"), at 4, available at https://www.regulations.gov/document?

D=EPA-HQ-OW-2017-0644-0003 (last visited Feb. 1, 2018). As the memorandum

acknowledged, these comments "require[d] sufficient time to process … before the agencies

c[ould] review [them] and develop appropriate responses." Id.

63.     Administrator Pruitt, however, appeared uninterested in waiting. On November

16, 2017, Mr. Pruitt signed a hastily devised proposal to "amend the effective date of the …

Clean Water Rule"—"quickly" and retroactively—from August 28, 2015 to "two years from the

date" of the proposed rule's finalization. Effective-Date Proposal at 1; News Release, EPA and

the Army Propose to Amend the Effective Date of the 2015 Rule Defining "Waters of the U.S."

(Nov. 16, 2017), available at https://www.epa.gov/newsreleases/epa-and-army-propose-amend-

effective-date-2015-rule-defining-waters-united-states (last visited Feb. 1, 2018), and

https://perma.cc/LJ7S-QKR6 (permanent link). According to the proposal, which was also

signed by the Acting Assistant Secretary of the Army for Civil Works:

> [t]he amendment of the effective date of the 2015 Rule … would
> ensure that the regulatory definition of "waters of the United
> States" that existed prior to promulgation of the … [Clean Water
> Rule] in 2015 and that has been in effect nationwide since the 2015
> Rule was stayed on October 9, 2015, would remain in effect during
> the ongoing actions undertaken in response to the Executive Order.

Effective-Date Proposal at 4.

64.    The reason for the agency's abrupt change of plans was clear. In the wake of the

Sixth Circuit's October 2015 decision to temporarily enjoin the Clean Water Rule, the Supreme

Court had taken up a challenge to the Sixth Circuit's jurisdiction under the Clean Water Act. As

the agencies expected a decision from the Supreme Court "at any time[,]" the proposed

regulation was aimed at preventing the Clean Water Rule from returning to force. Effective-Date

Proposal at 6-7.

65.    The agencies soon changed tack again, however. When their proposal appeared in

the Federal Register on November 22, 2017—only six days later—it had been altered without

explanation. Proposed Suspension Rule, 82 Fed. Reg. at 55,542. Rather than attempting a

retroactive change to the Clean Water Rule's effective date, the agencies' new proposed

regulation was designed to "add an applicability date to the … Clean Water Rule" that would be

"two years from the date of final action" on the proposal. Id. Despite this change in approach, the

EPA and the Corps claimed—in largely identical language—that the outcome would somehow

be the same. In the words of the agencies:

> [t]he addition of the applicability date to the 2015 Rule … would
> ensure that the regulatory definition of "waters of the United
> States" that existed prior to promulgation of the … [Clean Water
> Rule] in 2015 and that has been in effect nationwide since the 2015
> Rule was stayed on October 9, 2015, would remain in effect during
> the ongoing actions undertaken in response to the Executive Order.

Id. The agencies made no effort to explain how their previous "regulatory definition" could be

revived by an action that left the language of the Clean Water Rule in the Code of Federal

Regulations rather than recodifying the prior text.

66.    Though their "applicability date" proposal was designed to alter the definition of

"waters of the United States," the EPA and the Corps again refused to solicit substantive public

comments on the issue. In defiance of federal law, the agencies declared that they "d[id] not

intend to engage in substantive re-evaluation of the definition of 'waters of the United States'

until the Step Two rulemaking"—that is, until the agencies decided to propose a replacement to

the rule they were suspending. Proposed Suspension Rule, 82 Fed. Reg. at 55,545. The agencies

accordingly refused to request public comments on "the specific content" of both their prior

regulatory scheme, which they planned to reinstate, and the Clean Water Rule, which would be

suspended. Id. Instead, they granted members of the public a "short comment period" of 21 days

in which to share their views on "whether it is desirable and appropriate to add an applicability

date to the 2015 Rule[;]" whether the proposed two-year suspension "should be shorter or

longer[;]" and "whether adding the applicability date [would] contribute[] to regulatory

certainty." Id. at 55,544-45.

67.    On February 6, 2018—less than three weeks after the Supreme Court rejected the

Sixth Circuit's claim of jurisdiction to issue a stay, Nat'l Ass'n of Mfrs., 2018 WL 491526, at

\*4—the defendant agencies published a final regulation "adding an applicability date … of February 6, 2020" to the Clean Water Rule "effective immediately[.]" Suspension Rule, 83 Fed. Reg. at 5,200, 5,203. According to the EPA and the Corps, until that date—and "[s]ubject to further action by the agencies"—they "will administer the regulations in place prior to the 2015 Rule, and will continue to interpret the statutory term 'waters of the United States' to mean the waters covered by those regulations, as they are currently being implemented, consistent with Supreme Court decisions and practice, and as informed by applicable agency guidance documents." Id. at 5,200. The agencies emphasized, however, that the language of the Clean Water Rule—rather than the regulations they now intend to implement—will remain in the Code of Federal Regulations. Id. at 5,205 (declaring that the "[a]ddition of a new applicability date to a rule is not tantamount to a repeal of a rule" as "[r]epeal would mean the text of the regulation would no longer exist in the Code of Federal Regulations, and that is not what this final rule does; instead, it adds text to the 2015 Rule").

## FIRST CAUSE OF ACTION
### Violation of the Administrative Procedure Act—Arbitrary and Unlawful Failure to Provide a Meaningful Opportunity for Public Comment

68.     The allegations of the preceding paragraphs are incorporated here by reference.

69.     In arbitrarily refusing to solicit public comments on the merits of suspending the Clean Water Rule, the Environmental Protection Agency and the Army Corps of Engineers violated the Administrative Procedure Act. See 5 U.S.C. §§ 553(c), 706(2); see also, e.g., N.C. Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755, 769-70 (4th Cir. 2012).

70.     With the Administrative Procedure Act, Congress established a vital "process for formulating, amending, … [and] repealing" agency regulations. 5 U.S.C. § 551(5). Three steps are required. First, an agency must publish a "[g]eneral notice of proposed rule making" that

includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Id. § 553(b). Second, the agency must give the public "an opportunity to participate in the rule making through submission of written data, views, or arguments[.]" Id. § 553(c). Finally, after considering all of the relevant comments received, the agency must respond to them on the record and "incorporate in the rules adopted a concise general statement of their basis and purpose." Id.

71.     "The important purposes of this notice and comment procedure cannot be overstated." N.C. Growers' Ass'n, 702 F.3d at 763. Rather than "erect[ing] arbitrary hoops through which federal agencies must jump without reason[,]" the process "improves the quality of agency rulemaking by exposing regulations to diverse public comment," "ensures fairness to affected parties," and "provides a well-developed record that enhances the quality of judicial review." Sprint Corp. v. FCC, 315 F.3d 369, 373 (D.C. Cir. 2003) (internal quotations omitted). When a proposed regulation is aimed at eliminating protections that were previously adopted by an agency, notice and comment also "ensures that … [the] agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal." Consumer Energy Council of Am. v. FERC, 673 F.2d 425, 446 (D.C. Cir. 1982), aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am., 463 U.S. 1216 (1983). The requirements of notice and comment, in short, "serve important purposes of agency accountability and reasoned decisionmaking"—and they "impose a significant duty on the agency." Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1132 (D.C. Cir. 1995).

72.     In directing members of the public to withhold substantive comments on the implications of suspending the Clean Water Rule—and in allowing only "a short … period" for comments—the EPA and the Corps unlawfully failed to provide a meaningful opportunity for

public comment. See, e.g., Proposed Suspension Rule, 82 Fed. Reg. at 55,545 (stating that the agencies were not "soliciting comment on the specific content" of their prior regulations or the Clean Water Rule). As the Fourth Circuit Court of Appeals held in North Carolina Growers' Association v. United Farm Workers, a federal agency that seeks to suspend one rule and revive another—even temporarily—may not refuse to solicit public comments on the "substance or merits" of either regulation. 702 F.3d at 769-70. The public, in short, was owed "a meaningful opportunity" to submit comments on the wisdom of the agencies' proposed action—comments that had to be addressed by the agencies before a final decision was made. Id.

73.    The need for substantive comments was underscored by the agencies' only substantive argument in defense of their new regulation. According to the notice of proposed rulemaking, the suspension rule is aimed at providing "regulatory continuity and clarity for the many stakeholders affected by the definition of 'waters of the United States.'" Proposed Suspension Rule, 82 Fed. Reg. at 55,543. As the EPA and the Corps have admitted, however, this rationale was essentially identical to the one they had offered in support of the Clean Water Rule itself, which was designed to establish clearer and more predictable lines than the case-by-case approach of the agencies' prior regulatory scheme. Proposed Repeal Rule, 82 Fed. Reg. at 34,901 (noting that the Clean Water Rule was developed to "provide clarity and certainty on the scope of the waters protected by the CWA"). Given the agencies' about-face on the question of how best to establish a clear regulatory scheme, they were required to solicit, consider, and address public comments on the issue. See, e.g., FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515-16 (2009); N.C. Growers' Ass'n, 702 F.3d at 769-70. Because they arbitrarily failed to do so, the challenged rule should be set aside. See 5 U.S.C. §§ 553(c), 706(2).

**SECOND CAUSE OF ACTION**
**Violation of the Administrative Procedure Act—Arbitrary and Unlawful**
**Failure to Consider and Address the Merits of the Suspension Rule**

74.    The allegations of the preceding paragraphs are incorporated here by reference.

75.    In arbitrarily refusing to consider the implications of suspending the Clean Water Rule's protections, the Environmental Protection Agency and the Army Corps of Engineers further violated the Administrative Procedure Act. See 5 U.S.C. §§ 553(c), 706(2).

76.    Under the Administrative Procedure Act, federal agencies are obligated to "examine the relevant data and articulate … satisfactory explanation[s] for … [their] action[s]"—explanations that address every "important aspect" of the problems at hand. Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). As the Supreme Court noted in FCC v. Fox Television Stations, "the requirement that an agency provide reasoned explanation for its action … ordinarily demand[s] that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books." 556 U.S. at 515 (emphasis in original). When an action reverses an agency's previous position, moreover, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." Id. at 515-16.

77.    In refusing to "undertake any substantive reconsideration" of either the Clean Water Rule or their prior regulatory scheme, Proposed Suspension Rule, 82 Fed. Reg. at 55,545, the EPA and the Corps defied these requirements. Rather than "display[ing] awareness" that they were "changing position" by suspending the Clean Water Rule's protections, Fox Television Stations, Inc., 556 U.S. at 515, the agencies repeatedly insisted that their new regulation would merely "maintain the legal status quo[.]" Proposed Suspension Rule, 82 Fed. Reg. at 55,542; see

id. (declaring that the suspension rule "would simply … leav[e] in place the current legal status quo while the agencies continue to engage in substantive rulemaking to reconsider the definition of 'waters of the United States'"); id. at 55,544-45 (declaring that the suspension rule would "simply … ensure continuance of the legal status quo" as "a temporary, interim measure pending substantive rulemaking"). And rather than providing "a reasoned explanation … for disregarding" the extensive record assembled in support of the Clean Water Rule, Fox Television Stations, Inc., 556 U.S. at 515-16, the agencies refused give their prior action any consideration at all. See, e.g., Proposed Suspension Rule, 82 Fed. Reg. at 55,545 (declaring that "[t]he agencies d[id] not intend to engage in substantive re-evaluation of the definition of 'waters of the United States' until the Step Two rulemaking"). The agencies made no effort, even, to demonstrate that their action was consistent with the Clean Water Act and its objective of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); Fox Television Stations, Inc., 556 U.S. at 515 (noting that an "agency must show that … [a] new policy is permissible under the statute" it purports to be implementing).

78.    Because the EPA and the Corps flouted the fundamental requirements of the Administrative Procedure Act, the challenged rule should be set aside. See 5 U.S.C. §§ 553(c), 706(2).

**THIRD CAUSE OF ACTION**
**Violation of the Administrative Procedure Act—Arbitrary and Unlawful Failure to Restore the Text of the Governing Rules to the Code of Federal Regulations**

79.    The allegations of the preceding paragraphs are incorporated here by reference.

80.    In declaring that they "will administer the regulations in place prior to the 2015 Rule, and will continue to interpret the statutory term 'waters of the United States' to mean the waters covered by" them, without restoring the previous regulations to the Code of Federal

Regulations, the EPA and the Corps violated the Administrative Procedure Act. Suspension

Rule, 83 Fed. Reg. at 5,200; 5 U.S.C. §§ 552(a)(1)(D)-(E), 553(d).

81.    In order to provide "for the guidance of the public[,]" the Administrative

Procedure Act requires federal agencies to publish the language of any substantive regulation

that they intend to have legal effect. See 5 U.S.C. §§ 552(a)(1)(D)-(E), 553(d). As the Office of

the Federal Register has explained in its Document Drafting Handbook, an agency that "wish[es]

to restore ... [its] previous text" after suspending an existing regulation must accordingly "add

the previous text back to the CFR[.]" Office of the Federal Register, Document Drafting

Handbook (May 2017), at 3-11, available at https://www.archives.gov/files/federal-

register/write/handbook/ddh.pdf (last visited Feb. 6, 2018), and https://perma.cc/FUB5-VPCV

(permanent link). The defendant agencies refused to do this, however, declaring that they would

instead "administer the regulations in place prior to the 2015 Rule" while leaving the language of

the Clean Water Rule in the Code of Federal Regulations. See Suspension Rule, 83 Fed. Reg. at

5,200; id. at 5,205 (declaring that the "[a]ddition of a new applicability date to a rule is not

tantamount to a repeal of a rule" as "[r]epeal would mean the text of the regulation would no

longer exist in the Code of Federal Regulations, and that is not what this final rule does; instead,

it adds text to the 2015 Rule"). Because the defendant agencies have defied the requirements of

the Administrative Procedure Act, the Court should vacate the challenged rule. See 5 U.S.C. §

706(2).

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court:

82.    Declare that the U.S. Environmental Protection Agency and the U.S. Army Corps

of Engineers acted arbitrarily and unlawfully in promulgating the challenged rule, Definition of

"Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. at 5,200;

83.    Vacate and set aside the challenged regulation;

84.    Award plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

85.    Grant plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this the 6th day of February, 2018.

s/ J. Blanding Holman IV
D.S.C. Bar No. 9805
bholman@selcsc.org
Southern Environmental Law Center
463 King Street, Suite B
Charleston, SC 29403
Telephone:  (843) 720-5270
Facsimile:  (843) 414-7039

s/ Frank S. Holleman III
Bar No. 1911
fholleman@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC  27516-2356
Telephone:  (919) 967-1450
Facsimile:  (919) 929-9421

*Attorneys for Plaintiffs*
