**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, CHARLESTON WATERKEEPER, AMERICAN RIVERS, CHATTAHOOCHEE RIVERKEEPER, CLEAN WATER ACTION, DEFENDERS OF WILDLIFE, FRIENDS OF THE RAPPAHANNOCK, NORTH CAROLINA COASTAL FEDERATION, and NORTH CAROLINA WILDLIFE FEDERATION | ) ) ) ) ) ) ) ) ) ) ) | No. 2-18-cv-330-DCN |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| E. SCOTT PRUITT, as Administrator of the United States Environmental Protection Agency; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; R.D. JAMES, as Assistant Secretary of the Army for Civil Works; and UNITED STATES ARMY CORPS OF ENGINEERS | ) ) ) ) ) ) ) ) ) ) | **ORDER** |
| Defendants. | ) | |

This matter is before the court on defendants Scott Pruitt ("Pruitt"), the United

States Environmental Protection Agency ("the EPA"), Ryan Fisher ("Fisher"), and the

United States Army Corps of Engineers' ("the Army Corps, collectively "the

government") motion to transfer case to the Southern District of Texas, ECF No. 13, and

proposed intervenor-defendants American Farm Bureau Federation, American Forest &

Paper Association, American Petroleum Institute, American Road and Transportation

Builders Association, Leading Builders of America, Matagorda Farm Bureau, National

Alliance of Forest Owners, National Association of Home Builders, National Association

of Manufacturers, National Cattlemen's Beef Association, National Corn Growers Association, National Mining Association, National Pork Producers Council, National Stone, Sand and Gravel Association, Public Lands Council, Texas Farm Bureau, and U.S. Poultry & Egg Association's (collectively, "the business groups") motion to intervene, ECF No. 16. For the reasons set forth below, the court denies the motion to transfer and grants the motion to intervene.

## I.  BACKGROUND

This case arises out of the promulgation of a rule ("the Suspension Rule") that suspends the 2015 Clean Water Rule ("the WOTUS rule") for two years. The Clean Water Act ("the Act") prohibits discharge of pollutants from a point source into "navigable waters" without a permit. 33 U.S.C. §§ 1311(a), 1342, 1344, 1362(12). The Act defines "navigable waters" as "waters of the United States, including the territorial seas" but does not define what constitute "waters of the United States." In 1980, the Environmental Protection Agency ("the EPA") and in 1982 the Army Corps of Engineers ("the Army Corps") issued a regulation that defined the term "waters of the United States," (hereinafter, "the 1980s regulation"). Under the 1980s regulation, the term "waters of the United States" included interstate waters including interstate wetlands, other waters such as "intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds," and wetlands adjacent to these waters. The 1980s regulation specifically excluded "waters that are themselves wetlands" as a "waters of the United States."

On August 28, 2015, the EPA and the Army Corps enacted the WOTUS rule to clarify what types of waters constitute a "waters of the United States" and are thus

covered by the Act.  The WOTUS rule replaced the 1980s regulation, and includes seasonal streams, wetlands, and tributaries as a "water of the United States."  Soon after its enactment, the WOTUS rule became embroiled in litigation, with cases being brought in district courts across the country, including the Southern District of Texas ("the Texas litigation").  The government petitioned the Judicial Panel on Multi-District Litigation to consolidate these district court actions, which the Panel denied in October 2015.

All of the challenges to the district court decisions regarding the WOTUS rule were consolidated in the Sixth Circuit.  In February 2016, the Sixth Circuit ruled that it had original jurisdiction over challenges to the WOTUS rule and issued a nationwide stay of the rule.  At the time that the Sixth Circuit issued its nationwide stay of the WOTUS rule, in separate proceedings the District of North Dakota had issued a preliminary injunction against the WOTUS rule effective in thirteen states.  As a result of this ruling by the Sixth Circuit, the pending district court cases were either stayed or administratively closed.  On January 22, 2018, the United States Supreme Court ruled that the circuit courts did not have original jurisdiction to review the WOTUS rule, and that challenges must continue to be filed in the district courts.  The Sixth Circuit then vacated the nationwide stay of the WOTUS rule.  The injunction against the WOTUS rule issued by the District of North Dakota stayed in place.

On February 28, 2017, President Donald Trump issued Executive Order 13, 778, which directed the Administrator of the EPA Scott Pruitt ("Pruitt") and the Assistant Secretary of the Army for Civil Works Ryan Fischer ("Fischer") to "review the . . . [WOTUS rule] . . . for consistency with . . . [administration] policy . . . and publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and

consistent with [the] law." On February 6, 2018, the Suspension Rule was published in the Federal Register. The effect of the Suspension Rule was that the WOTUS rule was delayed until 2020, and in the interim period the controlling interpretation of "waters of the United States" was that prescribed by the 1980s regulation which had been in place prior to the WOTUS rule.

On the same day that the Suspension Rule went into effect, a coalition of conservation groups consisting of the South Carolina Coastal Conservation League, Charleston Waterkeeper, American Rivers, Chattahoochee Riverkeeper, Clean Water Action, Defenders of Wildlife, Friends of the Rappahannock, North Carolina Coastal Federation, and the North Carolina Wildlife Federation (collectively, "environmental plaintiffs") filed suit against the manner in which the Suspension Rule was enacted. Environmental plaintiffs allege the following claims: (1) in promulgating the Suspension Rule, the EPA and Army Corps violated the Administrative Procedure Act ("APA") by taking action with inadequate public notice and comment as prescribed by the APA; (2) the government's failure to consider the substantive implications of suspending the WOTUS rule in enacting the Suspension Rule was arbitrary and capricious under the APA, which directs federal agencies to "examine the relevant data and articulate . . . satisfactory explanation[s] for . . . [their] action[s]"; and (3) the government's failure after enacting the Suspension Rule to restore the 1980s regulation to the Federal Register violates the APA, which requires federal agencies to publish the language of any substantive regulation that they intend to have legal effect. Environmental plaintiffs ask the court to declare that the EPA and the Army Corps acted arbitrarily and unlawfully in promulgating the Suspension Rule, and to vacate the Suspension Rule.

On February 6th, 2018, the government filed a motion to transfer the case to the Southern District of Texas. ECF No. 13. Environmental plaintiffs filed a response on March 1, 2018, ECF No. 19, and the government filed a reply on March 8, 2018, ECF No. 25. On March 14, 2018, environmental plaintiffs filed a sur-reply. ECF No. 29. On February 28, 2018, the business groups filed a motion to intervene. ECF No. 16. On March 14, 2018, environmental plaintiffs filed a response. ECF No. 30. On March 21, 2018, the business groups filed a reply. ECF No. 21. Both motions have been fully briefed and are now ripe for the court's review.

## II. STANDARDS

### A. Motion to Transfer

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented. "The burden is on the movant to show that transfer pursuant to Section 1404(a) is proper." Virginia Innovation Scis., Inc. v. Samsung Elecs. Co., 928 F. Supp. 2d 863, 867 (E.D. Va. 2013). "'Decisions whether to transfer a case pursuant to 28 U.S.C. § 1404 are committed to the discretion of the transferring judge.'" Herring v. LaPolla Indus., Inc., 2013 WL 12148849, at *3 (D.S.C. Oct. 7, 2013) (quoting Brock v. Entre Computer Ctrs., Inc., 933 F.2d 1253, 1257 (4th Cir. 1991)). In exercising this discretion, courts weigh a number of factors:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial

easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

Id.

### B.    Intervention by Right

Under Federal Rule of Civil Procedure 24(a), on timely motion, a court must permit anyone to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). The Fourth Circuit has interpreted this rule to require that applicants seeking to intervene as of right to meet all four of the following criteria:

(1) the application to intervene must be timely; (2) the applicant must have an interest in the subject matter of the underlying action; (3) the denial of the motion to intervene would impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the existing parties to the litigation.

Houston Gen. Ins. Co. v. Moore, 193 F.3d 838, 839 (4th Cir. 1999). The party moving to intervene "bears the burden of demonstrating to the court a right to intervene." Matter of Richman, 104 F.3d 654, 658 (4th Cir. 1997).

### C.    Permissive Intervention

Federal Rule of Civil Procedure 24(b) enables the court to permit, on timely motion, "anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). The decision to allow permissive intervention under Rule 24(b) "lies within the sound discretion of the trial court," though "some standards have been developed to guide the courts in making

intervention determinations." <u>Hill v. W. Elec. Co.</u>, 672 F.2d 381, 386 (4th Cir. 1982). In the Fourth Circuit, a movant seeking permissive intervention as a plaintiff must satisfy four criteria. First, the motion must be timely. Fed. R. Civ. P. 24(b)(2); <u>Spring Const. Co. v. Harris</u>, 614 F.2d 374, 377 (4th Cir. 1980). Second, the movant must have "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B); <u>Pa. Nat. Mut. Cas. Ins. Co. v. Perlberg</u>, 268 F.R.D. 218, 225 (D.Md. 2010). Third, there must be an independent ground of subject matter jurisdiction. <u>Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co.</u>, 223 F.R.D. 386, 387 (D.Md. 2004). Finally, the proposed intervention must not "unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b)(3); <u>see also</u> <u>Hill</u>, 672 F.2d at 386 (4th Cir. 1982) (quoting <u>Harris</u>, 614 F.2d at 377)).

### III.  DISCUSSION

This matter is before the court on two motions.[1] The government seeks to have this case transferred to the Southern District of Texas under 28 U.S.C. § 1404(a), arguing that this case is "part and parcel" of the Texas litigation. The business groups seek to intervene as defendants in this case. The court denies the motion to transfer the case, and grants the business groups' motion to intervene.

### A.  Motion to Transfer

As a threshold matter, the government urges the court to send this suit to the Southern District of Texas by characterizing it as "the latest in a series of cases relating to

---

[1] The parties use different terms in their briefing to refer to the 2015 Clean Water Rule and the 2018 rescission of that rule. Any reference to the "2015 Rule" or "the Clean Water Rule" is what the court refers to as "the WOTUS rule" and any reference to "the applicability rule" or "the 2018 rule" is what the court refers to as "the Suspension rule."

the Defendant Agencies' issuance in 2015 of a regulation that defines the "waters of the United States." ECF No. 13 at 2. This is a mischaracterization of the fundamental nature of this case. This is not a case about the legality of the issuance or even the merits of the WOTUS rule. It is a case about the legality of the process by which the WOTUS rule was suspended. Having established this, the court now consider whether this action should be transferred to Texas.

In deciding whether to transfer venue, "a district court must make two inquiries: (1) whether the claims might have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum." Koh v. Microtek Int'l, Inc., 250 F. Supp. 2d 627, 630 (E.D. Va. 2003).

### 1. Proper Venue under 28 U.S.C. § 1391

The court must first determine whether environmental plaintiffs could have brought this claim in the Southern District of Texas as the government asserts. The proper venue provision governing this analysis is § 1391(e)(1), which provides that a plaintiff may sue a federal agency or official in a judicial district where "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." If the case falls within one of these three categories, venue is proper. Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 571 U.S. 49 (2013).

As to the first factor, the EPA and the Army Corps of Engineers "reside in" the District of Columbia as this is where the agencies are headquartered. A federal agency does not reside in a district merely by virtue of having an office in that district. See

Reuben H. Donnelley Corp. v. F.T.C., 580 F.2d 264, 267 (7th Cir. 1978) (reasoning that "to hold that a federal agency can be sued . . . wherever it maintains an office would, as a practical matter, render [§ 1391(e)'s other subsections] superfluous," because federal agencies are likely to maintain offices in "most, if not all, judicial districts").  Venue with respect to a federal officer is proper in the place of his or her official residence, where his or her official duties are performed.  Archuleta v. Sullivan, 725 F.Supp. 602, 605 (D.D.C. 1989).  The government points to Dehaemers v. Wynne, 522 F. Supp. 2d 240 (D.D.C. 2007) as instructive on this issue of where a federal agency resides.  Certainly, in Dehaemers the court found that venue "might be proper" proper in Washington, D.C., where the agency in that particular case—the United States Department of the Air Force—maintained an office.  Id. at 248.  Notably, however, the Dehaemers court in that case held that the agency head, the Secretary of the Air Force, performed a "significant amount" of his official duties in the District of Columbia.  Id.  The government has not ever alleged that Pruitt or Fischer performed any amount—let alone a "significant amount"—of their official duties in the Southern District of Texas.  This distinguishes Dehaemers from the case at hand.  Neither Pruitt nor Fischer have official residences in the Southern District of Texas.  Therefore, none of the defendants "reside in" the Southern District of Texas.

Second, the government has failed to meet its burden to show that events in Texas led to the promulgation of the Suspension Rule.  Instead, it is apparent that the events leading to the suspension of the WOTUS rule took place in Washington, D.C.— Washington is where President Trump signed the executive order directing the EPA to rescind or revise the WOTUS rule and it is where the EPA drafted and issued the final

Suspension Rule. The government argues that the Suspension Rule was issued "against the backdrop of litigation" around the country, including the Texas litigation. In support, the government points to the preamble of the Suspension Rule which states that one of the rationales for the Suspension Rule includes the snowstorm of litigation surrounding the WOTUS rule and the resulting regulatory uncertainty. But the preamble to the Suspension Rule lists a number of considerations—only one of which is the "many" district cases that are pending against the WOTUS rule. The preamble does not state that the litigation that the WOTUS rule is currently embroiled in is the only—or even the most important—reason for the enactment of the Suspension Rule. Furthermore, there are more than ten separate challenges to the WOTUS rule that are pending before district courts in states from North Dakota to Georgia. Only three of these challenges are before the Texas court. Certainly, at no point does the preamble to the Suspension Rule specify that the Texas litigation is the <u>primary</u> reason why the Suspension Rule was enacted.

Finally, since no real property is involved in this action, the court can transfer venue if the environmental plaintiffs "reside in" the Southern District of Texas. For purposes of § 1391(e)(1)(C), venue is proper in a multi-plaintiff case if <u>any</u> plaintiff resides in the district. <u>See</u> <u>Exxon Corp. v. Fed. Trade Commission</u>, 588 F.2d 895 (3rd Cir. 1978) (holding that the reference to "the plaintiff" in § 1391(e)(1)(C) means "any plaintiff," as opposed to "all plaintiffs"). None of the environmental plaintiffs, which are all conservation organizations, even have offices in the Southern District of Texas. Two of the environmental plaintiffs, the South Carolina Coastal Conservation League and the Charleston Waterkeeper, operate exclusively in South Carolina. The remaining environmental plaintiffs are either headquartered in the Southeast, such as the North

Carolina Wildlife Federation, or are national organizations such as American Rivers. None of the environmental plaintiffs have any offices or significant presence in the Southern District of Texas.

The defendants in the instant action may already be defendants in the Texas litigation. But that is because of the plaintiffs in that case at least one plaintiff, namely the State of Texas, "resides in" the Southern District of Texas for venue purposes. None of the three factors set forth in § 1391(e) are applicable here. The environmental plaintiffs could have brought this suit in Washington, D.C. or in one of the districts in which one of the environmental plaintiffs resides. They chose the latter, and so this case was brought in front of this court. Because this case could not have been filed in the Southern District of Texas, it does not fulfill the first step of the venue transfer analysis. The court denies the motion to transfer on this ground alone. Nonetheless, the court proceeds to analyze the § 1404(a) factors to demonstrate that even if this action could have been filed in the Southern District of Texas, the § 1404(a) factors do not weigh in favor of transfer.

## 2. § 1404(a) Factors

As explained above, this case could not have been filed in the Southern District of Texas. But even if it could have been, the § 1404(a) factors would weigh against transfer.

The second step of the § 1404(a) venue transfer analysis requires the court to balance three factors: (1) the environmental plaintiffs' choice of forum; (2) convenience of the parties and witnesses; and (3) the interest of justice. The first factor obviously weighs in favor of retaining the suit in the current venue, as Charleston is the forum that

the environmental plaintiffs chose to file suit. Analysis of the second factor, the convenience to the parties and witnesses, is also relatively simple—both parties agree that this is an administrative review case, where discovery will not consist of depositions or subpoenas but a review of the closed world of documents before the EPA at the time that it promulgated the Suspension Rule. There are simply no witnesses to consider. The government is no more burdened by litigating this case in Charleston, South Carolina than it would be by litigating it in Galveston, Texas. Environmental plaintiffs, on the other hand, would be. Two of the environmental plaintiffs are Charleston-based organizations and the remainder have offices in the Carolinas and the Southeast. None have offices in Texas. This factor weighs in favor of environmental plaintiffs.

The third factor, "the interests of justice," is a more nuanced inquiry. The government argues that this case could have been brought anywhere else in the country, and that South Carolina has no more of an interest in the WOTUS rule than any other state. The court agrees that this case could have been brought elsewhere. And indeed, it was—a coalition of ten attorney generals, led by the State of New York, filed suit in the Southern District of New York alleging that the Suspension Rule was promulgated in violation of the requirements of the APA. See New York v. Pruitt, 2018 WL 1684341, at *1 (S.D.N.Y. Apr. 5, 2018). The Natural Resources Defense Council brought suit with substantially the same allegations in the Southern District of New York as well. However, the fact that other plaintiffs have brought suit does not negate South Carolina's particularized interest in the WOTUS rule.

Indeed, a review of the WOTUS rule makes clear that it grants specific protections to the Carolina bays and the pocosins of the Southeastern coastal plain, many

of which are located in South Carolina. Specifically, the WOTUS rule states that the Carolina bays, which are wetlands "most abundant in North Carolina and South Carolina" are protected under the Act. 80 Fed. Reg. at 37, 072. The WOTUS rule also afforded protections for pocosins, "shrub and tree-dominated wetlands" found from Virginia to northern Florida, necessarily encompassing South Carolina. Id. The Suspension Rule rescinds protections for these types of wetlands. The WOTUS rule went on to state, wetlands "significantly affect the chemical, physical, and biological integrity of downstream waters." Thus, the Suspension Rule affects not only pocosins and Carolina bays but also all of the rivers and lakes in South Carolina that are downstream from these wetlands. This qualifies as an interest held by South Carolina and its citizens in the protections afforded to South Carolina waterways, which communities throughout the state depend on for tourism and contribute to the state's economy. Certainly, it is not the case that South Carolina "has no discernable connection with the controversy" as the government contends. ECF No. 13 at 15.

Finally, this court is not the first to deny the government's attempt to transfer venue in a case involving the rescission of regulations promulgated by the previous administration. The court finds guidance in the Northern District of California's well-reasoned opinion in State v. Bureau of Land Mgmt., 286 F. Supp. 3d 1054 (N.D. Cal. 2018), where the government sought to transfer a case about the United States Bureau of Land Management's proposed suspension of a rule that would delay the requirements of the Waste Prevention, Production Subject to Royalties, and Resource Conservation rule ("the Waste Prevention rule") to the District of Wyoming. The government argued that the Wyoming court was concurrently hearing challenges to the Waste Prevention rule,

13

and so the case about the proposed suspension of that rule was best heard in Wyoming so the action could be litigated "in a coordinated fashion." Id. The Northern District of California rejected this argument, reasoning that transfer was unwarranted because of the distinctness of the legal issues—namely, that the legal issues that the Wyoming court was concerned with "go to the substance of that regulation" whereas the present suit "addresses the BLM's alleged procedural failure to justify a different rule, the Suspension Rule." Id. This analysis demonstrates how courts have distinguished suits against the merits of a rule—such as the Texas litigation—from suits against the legality of the procedure by which these rules were rolled back—the suit before this court.

Now, the court acknowledges that there is a difference between the litigation over the suspension of the Waste Prevention rule and the litigation at hand—namely, that the Texas court is currently considering a motion for preliminary injunction to enjoin the WOTUS rule altogether. The government argues that if this court enjoins the Suspension Rule, such a ruling would reinstate the WOTUS rule which could conflict with the possibility that the Texas court issue a nationwide injunction against the WOTUS rule. Environmental plaintiffs present a different picture of the relationship between the WOTUS rule and the Suspension Rule, arguing in effect that while both the Texas litigation and this litigation involve water, the similarities end there. The court is not particularly convinced by the environmental plaintiffs' argument that this litigation will not affect the preliminary injunction motion before the Texas court. But the outcome of this litigation would affect each of the eleven currently pending challenges against the WOTUS rule in district courts across the country. This does not necessarily weigh in favor of transferring this suit to Texas.

To resolve this litigation, environmental plaintiffs argue, the court need not delve into the merits of the WOTUS rule. The agencies' refusal to grapple with the substance of the WOTUS rule, which was produced after years of public notice and comment rulemaking and with support drawn from over a thousand peer-reviewed scientific articles, forms the basis of one of the claims that environmental plaintiffs levy in this case. The court is not convinced that this litigation is "part and parcel" of the litigation over the merits of the WOTUS rule. It views the two cases as entirely separate, albeit related in subject matter. Therefore, the orderly adjudication of the cases challenging the WOTUS rule and this case challenging the Suspension rule does not require them to be combined.[2]

In sum, the Texas litigation and this litigation address different substantive issues, although both do touch on the reach of the "waters of the United States" under the Act. Under the applicable venue provision of 1391(e), federal defendants are residents of Washington D.C., not Texas. The events that gave rise to the promulgation of the Suspension Rule occurred in Washington D.C., not Texas. None of the environmental plaintiffs "reside in" Texas. Therefore, this litigation could not have been filed in the Southern District of Texas. Even assuming that this suit could have been filed in the

---

[2] Tangentially—yet persuasively—the panel for multidistrict litigation rejected the government's request for the centralization of the 11 original district court cases that were filed challenging the WOTUS rule. In front of the panel for multidistrict litigation too, the government argued that the "orderly adjudication" of the issue required that these district court cases be consolidated. The court takes this opportunity to reiterate that the "issue" in front of the multidistrict litigation panel was the legality of the WOTUS rule, not the legality of the WOTUS rule as well as the legality of the way in which the WOTUS rule was rescinded by way of the Suspension rule. If the first issue was not centralized enough to necessitate a multidistrict litigation, certainly the issue in this litigation is not either.

Southern District of Texas, the government has not met its burden of showing that the balance of all the § 1404(a) factors clearly favor transfer. South Carolina does have an interest in the Suspension Rule, as the WOTUS rule provided specific protection for wetlands common in the Southeast and contained within South Carolina's borders. Therefore, the court refuses to override environmental plaintiffs' choice of forum in this district and denies the motion to transfer.

### B. Motions to Intervene

A coalition of eighteen business groups move to intervene in this litigation. The court makes no finding on whether the groups are entitled to intervention as of right, but rather grants them permissive intervention, given the early stage of this litigation and the participation of the business groups in the litigation challenging the WOTUS rule in district courts across the country.

To intervene of right under Rule 24(a), an applicant must satisfy all four of the following requirements: (1) the application must be timely; (2) the applicant must have an interest in the subject matter sufficient to merit intervention; (3) the denial of intervention would impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the existing parties to the litigation. See Fed. R. Civ. P. 24(a). Rule 24(b), which addresses permissive intervention, provides that "[u]pon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b).

Under either method of intervention, the intervention must be timely.  Gould v. Alleco, Inc., 883 F.2d 281, 286 (4th Cir. 1989) ("Both intervention of right and permissive intervention require timely application.").  To determine whether an application for intervention is timely, the Fourth Circuit has outlined the following factors: how far the suit has progressed, the prejudice that delay might cause other parties, and the reason for the tardiness in moving to intervene.  Gould v. Alleco, Inc., 883 F.2d 281, 286 (4th Cir. 1989).  In United States v. S. Bend Cmty. Sch. Corp., 710 F.2d 394, 396 (7th Cir. 1983), the Seventh Circuit held that prospective intervenor generally must move promptly for intervention as soon as he "knows or has reason to know that his interests might be adversely affected by the outcome of the litigation."  The purpose of the timeliness requirement is to prevent a tardy intervenor from "derailing a lawsuit within sight of the terminal."  Scardelletti v. Debarr, 265 F.3d 195, 202 (4th Cir. 2001) (internal citations and quotations omitted), rev'd sub nom. on other grounds, Devlin v. Scardelletti, 536 U.S. 1 (2002).  These motions to intervene are timely, as they were filed within twenty-two days of the filing of the initial complaint.  No discovery has been conducted or dispositive motions decided.  Having determined that the intervenors meet this threshold standard of timeliness, the court moves on to the merits.

To support a right to intervene the potential intervenor's interest in the dispute "must be direct, rather than remote or contingent."  Dairy Maid Dairy, Inc. v. United States, 147 F.R.D. 109, 111 (E.D. Va. 1993).  Certainly, the business groups have an interest in the subject matter of the litigation.  Namely, the industries that these business groups represent operate in a regulatory sphere that include regulations governing water usage in the United States.  The court must then evaluate whether "denial of the motion

to intervene would impair or impede the . . . ability to protect [their] interest" and whether the proposed intervenor's "interest is []adequately represented by the existing parties to the litigation." Moore, 193 F.3d at 839. Courts generally do not define the parties' "ultimate objectives" by the specific causes of action they seek to advance; instead, they define the "ultimate objectives" in more general terms. See In re: CEI, LLC, 2016 WL 3556606, at *5 (W.D.N.C. June 29, 2016) ("The trustee and [a]ppellant share the same objective in this adversarial action based on the fact that they both seek relief and recovery for the allegedly fraudulent actions of the [d]efendants."), reconsideration denied sub nom. In re CEI, LLC, 2016 WL 4385859 (W.D.N.C. Aug. 12, 2016); Thomas v. Ford Motor Co., 2014 WL 1315006, at *4 (D.S.C. Mar. 28, 2014) (finding that proposed intervenors who advanced a claim not brought by the original plaintiffs shared "the same ultimate concerns as [p]laintiffs, namely their contention that FMC knowingly manufactures automobiles equipped with an electronic throttle control system that renders the automobiles susceptible to incidents of sudden unintended acceleration and, as a consequence, unsafe to customers").

Environmental plaintiffs argue at length that the business groups have not satisfied the standard for intervention of right set forth in Stuart v. Huff, 706 F.3d 345 (4th Cir. 2013), where the Fourth Circuit explained "that where the party who shares the intervenor's objective is a government agency, the intervenor has the burden of making a strong showing of inadequacy" because "when a statute comes under attack, it is difficult to conceive of an entity better situated to defend it than the government." Id. at 351. The Fourth Circuit reasoned that "to permit private persons and entities to intervene in the government's defense of a statute upon only a nominal showing would greatly complicate

the government's job."  Id.  Thus, the Fourth Circuit said that when the government agency and the would-be intervenor share the same objective, "the putative intervenor must mount a strong showing of inadequacy. To hold otherwise would place a severe and unnecessary burden on government agencies as they seek to fulfill their basic duty of representing the people in matters of public litigation."  Id. at 352.

The court is not so persuaded that the business groups share the same ultimate objective as the government.  The EPA is, after all, in the business of protecting the environment—not protecting business interests.  The EPA's stated motivation in enacting the Suspension Rule included, certainly, creating regulatory certainty for businesses such as the industries that the business groups represent.  But it also involved policy considerations of what waters in the United States deserved protection under the Act. Furthermore, while the government is defending the legality of the Suspension Rule in this court, aligning itself with the position of the business groups, the government is the adversary of the business groups in the pending WOTUS litigation in district courts across the country as it is defending.  In that pending litigation, this court assumes, the government will continue to defend the merits of the WOTUS rule against these very same business groups' challenges.  In short, in that pending litigation over the WOTUS rule the government is, as the business groups pointed out during the hearing on this motion, "on the opposite side of the v."  But it is ultimately unnecessary for this court to speculate on whether the standards for mandatory intervention are satisfied under Stuart, because even if the business groups cannot intervene as of right, this court grants them permissive intervention under Rule 24(b).

The court sees no barriers to granting the business groups permissive intervention. The court is willing to assume that the court possesses an independent ground of subject matter jurisdiction over their claims and environmental plaintiffs have not seriously disputed that the claims the business groups seek to bring here share a common question of law or fact with the main action. Certainly, allowing the business groups to intervene in this action would lead to some delay in this litigation, as the court would possibly be required to resolve an additional motion to dismiss before moving on to discovery. This litigation is already quite complicated, and adding the business groups would only result in further complication. But the business groups filed timely motions to intervene and have a substantial stake in the outcome of this litigation. If the Suspension Rule is enjoined by this court, the WOTUS rule will be reinstated and greatly affect the regulatory burdens and associated costs on the industries that the business groups represent. All of these business groups have intervened in the maze of litigation surrounding the WOTUS rule in various district courts throughout the country, and the outcome of this case may affect those currently pending cases. Furthermore, as explained above, the government is adverse to the business groups in the pending WOTUS litigation on the merits of the rule and so will not protect the business groups' interests. And this case is in the very early stages of the litigation, so allowing the business groups permission to intervene will not delay or prejudice the timely adjudication of this case. Therefore, the court grants permissive intervention.[3]

---

[3] The court recognizes the environmental plaintiffs' consternation associated with adding more parties to this already complex litigation. But it notes that a review of the docket in the New York litigation, State of New York et al. v. E. Scott Pruitt et al., demonstrates that the states did not object to the permissive intervention of the business groups and took no position to the business groups' request for intervention as of right.

## IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** the government's motion to transfer

venue and **GRANTS** the business groups' motion to intervene.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**May 11, 2018**
**Charleston, South Carolina**

---

And as the business groups noted in a supplement filed after the hearing on this matter
was held, the New York court also found that permissive intervention was appropriate.
ECF No. 34, Ex. 1, New York litigation at 3–4.