**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| SOUTH CAROLINA COASTAL | ) | |
| CONSERVATION LEAGUE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| E. SCOTT PRUITT, et al., | ) | Case No. 2:18-cv-330-DCN |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN FARM BUREAU | ) | |
| FEDERATION, et al. | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

SUMMARY ................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

    I.   The "Waters of the United States" and the Clean Water Rule. ............................................3

    II.  The New Administration's Efforts to Eliminate the Clean Water Rule. ............................5

    III. The Suspension Rule...........................................................................................................6

STATUTORY FRAMEWORK....................................................................................... 8

    I.   The Administrative Procedure Act. ....................................................................................8

    II.  The Clean Water Act. .......................................................................................................10

STANDARD OF REVIEW ........................................................................................... 10

ARGUMENT ................................................................................................................ 11

    I.   The Agencies Violated Fundamental Administrative Procedure Act Public Notice
         and Comment Requirements...........................................................................................11

         A.  The agencies violated the APA by refusing to solicit public comment on the
             merits of suspending the Clean Water Rule and replacing it with previous
             regulations and guidance...........................................................................................12

         B.  In refusing to consider the substantive implications of suspending the Clean
             Water Rule, the EPA and the Corps violated the Administrative Procedure Act........14

         C.  In failing to publish the regulatory text they intend to implement, the EPA and
             the Corps violated the Administrative Procedure Act. ................................................17

    II.  The Plaintiff Organizations Have Standing to Challenge the EPA and the Corps'
         Unlawful Suspension of Clean Water Act Protections....................................................18

CONCLUSION.............................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Am. Med. Ass'n v. Reno,
    57 F.3d 1129 (D.C. Cir. 1995) .................................................................................9

BASF Wyandotte Corp. v. Costle,
    598 F.2d 637 (1st Cir.1979) ................................................................................11

Becerra v. U.S. Dep't of the Interior,
    276 F. Supp. 3d 953 (N.D. Cal. Aug. 30, 2017) .......................................................3

Buschmann v. Schweiker,
    676 F.2d 352 (9th Cir. 1982) ...............................................................................13

California v. U.S. Bureau of Land Mgmt.,
    277 F. Supp. 3d 1106 (N.D. Cal. Oct. 4, 2017) .......................................................3

Chocolate Mfrs. Ass'n v. Block,
    755 F.2d 1098 (4th Cir. 1985) .............................................................................11

Clean Air Council v. Pruitt,
    862 F.3d 1 (D.C. Cir. 2017) ...................................................................................2

Consumer Energy Council of Am. v. FERC,
    673 F.2d 425 (D.C. Cir. 1982), aff'd sub nom. Process Gas Consumers Grp. v.
    Consumer Energy Council of Am., 463 U.S. 1216 (1983).......................................9

Council of S. Mountains, Inc. v. Donovan,
    653 F.2d 573 (D.C. Cir. 1981) .............................................................................16

Envtl. Def. Fund, Inc. v. EPA,
    716 F.2d 915 (D.C. Cir. 1983) .............................................................................16

FCC v. Fox Television Stations, Inc.,
    556 U.S. 502 (2009).............................................................................14, 15, 18

Kollett v. Harris,
    619 F.2d 134 (1st Cir.1980)................................................................................13

Mack Trucks, Inc. v. EPA,
    682 F.3d 87 (D.C. Cir. 2012) ...........................................................................8, 13

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983)..............................................................................................14

N. C. Growers' Ass'n, Inc. v. United Farm Workers,
    702 F.3d 755 (4th Cir. 2012) ................................................................... 1, 8-14, 23

Nat. Res. Def. Council v. Abraham,
    355 F.3d 179 (2d Cir. 2004)........................................................................16

Nat. Res. Def. Council v. EPA,
    No. 1:18-cv-1048 (JPO) (S.D.N.Y.) ..........................................................16

Nat'l Venture Capital Ass'n v. Duke,
    291 F. Supp. 3d 5 (D.D.C. Dec. 1, 2017)....................................................3

New York v. Pruitt,
    No. 1:18-cv-1030 (JPO) (S.D.N.Y.) ..........................................................16

Open Communities All. v. Carson,
    286 F. Supp. 3d 148 (D.D.C. Dec. 23, 2017).............................................2, 3

Pennsylvania v. Trump,
    281 F. Supp. 3d 553 (E.D. Pa. Dec. 15, 2017)............................................3

Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs,
    No. CIV.A. 2:12-2942-RMG, 2013 WL 6488282 (D.S.C. Sept. 18, 2013) ...........................11

Prometheus Radio Project v. FCC,
    652 F.3d 431 (3d Cir.2011)........................................................................13

Puget Soundkeeper All. v. Pruitt,
    No. C15-1342JCC (W.D. Wash.) ...............................................................16

Rapanos v. United States,
    547 U.S. 715 (2006)...................................................................................3, 4

Sierra Club v. Jackson,
    833 F. Supp. 2d 9 (D.D.C. 2011) ...............................................................16

Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs,
    531 U.S. 159 (2001)...................................................................................3, 4

South Carolina v. Block,
    558 F. Supp. 1004 (D.S.C. 1983)...............................................................9

Sprint Corp. v. FCC,
    315 F.3d 369 (D.C. Cir. 2003)....................................................................9

Summers v. Earth Island Inst.,
    555 U.S. 488 (2009)...................................................................................19, 22

United States v. Riverside Bayview Homes, Inc.,
   474 U.S. 121 (1985)..................................................................................................3

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C. § 551 et seq...................................................1

   5 U.S.C. § 551(5) .................................................................................................8

   5 U.S.C. § 552(a)(1)(D) ..............................................................................17, 18

   5 U.S.C. § 552(a)(1)(E) ..............................................................................17, 18

   5 U.S.C. § 553 .....................................................................................................16

   5 U.S.C. § 553(b) ..................................................................................................9

   5 U.S.C. § 553(c) ..............................................................................................9, 13

   5 U.S.C. § 553(d) ........................................................................................17, 18

   5 U.S.C. § 706(2) ...............................................................................................18

   5 U.S.C. § 706(2)(A) ..........................................................................................10

   5 U.S.C. § 706(2)(D) ..........................................................................................10

Clean Water Act

   33 U.S.C. § 1311(a) ...........................................................................................10

   33 U.S.C. § 1362(7) ...........................................................................................10

   33 U.S.C. § 1362(12) .........................................................................................10

Pub. L. No. 92-500, § 101(a), 86 Stat. 816 (1972) (codified at 33 U.S.C.
   § 1251(a))..................................................................................................10, 15

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................11

Fed. R. Civ. P. 56(a) .................................................................................................11

**Regulations**

33 C.F.R. § 328.3(a)(7)(ii) ..........................................................................................2

33 C.F.R. § 328.3(a)(7)(iii) .........................................................................................2

Final Rule, Clean Water Rule: Definition of "Waters of the U.S.,"
80 Fed. Reg. 37,054 (June 29, 2015) ...............................................1, 2, 4, 5, 14, 18, 19, 21, 22

Final Rule, Definition of "Waters of the U.S."—Addition of an Applicability
Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018) ........................ 2, 8, 15-18

Proposed Rule, Definition of "Waters of the U.S."—Addition of an
Applicability Date to 2015 Clean Water Rule, 82 Fed. Reg. 55,542 (Nov.
22, 2017) ................................................................................................................2, 7, 8, 14, 15

Proposed Rule, Definition of "Waters of the U.S."—Amend. of Effective Date
of 2015 Clean Water Rule (Nov. 16, 2017) ................................................................................6

Proposed Rule, Definition of "Waters of the U.S."—Recodification of Pre-
Existing Rules, 82 Fed. Reg. 34,899 (July 27, 2017) ...........................................................5, 6

Proposed Rule, Definition of "Waters of the U.S." Under the Clean Water
Act, 79 Fed. Reg. 22,188 (Apr. 21, 2014) ...............................................................................22

**Other Authorities**

Doc. Drafting Handbook (May 2017), https://www.archives.gov/files/federal-
register/write/handbook/ddh.pdf, https://perma.cc/FUB5-VPCV ......................................7, 17

Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Feb. 28, 2017) ...................................................2, 5

H.R. Rep. No. 92-911 (1972)......................................................................................................10

S. Rep. No. 92-414 (1971) ...........................................................................................................10

# SUMMARY

When a federal agency proposes to revise or revoke a codified regulation, the Administrative Procedure Act, 5 U.S.C. §551 et seq., requires it to inform the public of the proposed course of action and to solicit the public's comment.  Where the agency "refus[es] to receive comments" on the merits of a proposed rulemaking, or to "consider or explain [the] relevant and significant issues" it raises, the agency "clearly" violates the fundamental requirements of the Administrative Procedure Act and the rulemaking must be set aside.  N.C. Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755, 769 (4th Cir. 2012) (internal quotations omitted).

In 2018, the defendants in this case suspended a fundamental 2015 Clean Water Act regulation and purported to put in place an accumulation of guidance and rules concerning the definition of water of the United States that existed prior to 2015. Yet the agencies refused to receive comments on that suspension and the change of regulatory definition, and they refused to consider, address, or disclose the effect of their actions, which sharply curtailed the scope of waters protected by the Clean Water Act.

The agencies' actions in 2018 contrast sharply with their actions in 2015.  When promulgating the definition of waters of the United States contained in the 2015 Clean Water Rule, the agencies declared their intention to "ensure protection for the nation's public health and aquatic resources," and to increase the "predictability and consistency" of the nation's water-quality programs by "clarifying the scope of 'waters of the United States' protected under the [Clean Water] Act."  Final Rule, Clean Water Rule: Definition of "Waters of the U.S.," 80 Fed. Reg. 37,054 (June 29, 2015).  Over four years, they reviewed thousands of studies, considered a detailed analysis by an agency advisory group, and conducted wide-ranging public outreach that

garnered nearly a million comments.  See id. at 37,056-57, 37,102-03.  The resultant rule strengthened protections for two types of wetlands – Carolina bays and pocosins – that occur in the Southeastern coastal plain.  See id. at 37,072; 33 C.F.R. § 328.3(a)(7)(ii)-(iii).

When the new administration came to power in 2017, however, it sought to eliminate the Clean Water Rule and to change the regulatory definition "quickly." Exec. Order No. 13,778, § 2(a), 82 Fed. Reg. 12,497 (Feb. 28, 2017).  The agencies did so on February 6, 2018, by finalizing a regulation that suspends the Clean Water Rule's protections for two years while the administration works to finalize a permanent repeal.  Final Rule, Definition of "Waters of the U.S."—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,206 (Feb. 6, 2018) (Dkt. No. 19-1) (AR 708). [1]

The agencies did not consider scientific research, did not convene an advisory committee, and shut down public comment.  Indeed, the agencies explicitly rejected "engag[ing] in substantive re-evaluation" of the Clean Water Rule and directed members of the public to withhold substantive comments "on the specific content" of both the Clean Water Rule and the prior regulatory scheme, which the Suspension Rule has attempted to revive.  Proposed Rule, Definition of "Waters of the U.S."—Addition of an Applicability Date to 2015 Clean Water Rule, 82 Fed. Reg. 55,542, 55,544, 55,545 (Nov. 22, 2017) (Dkt. No. 19-1) (AR 0001).

The Suspension Rule process short-circuited fundamental APA requirements and must now be added to the list of agency actions recently set aside to restore "the rule of law[.]"  Open Communities All. v. Carson, 286 F. Supp. 3d 148, 152 (D.D.C. Dec. 23, 2017). [2]  Accordingly,

---

[1] Documents in the administrative record contain the prefix EPA-HQ-OW-2017-0644 followed by the document number.  See Administrative Record Index (Dkt. No. 39).  Plaintiffs have omitted the prefix in citations to the administrative record.

[2] See, e.g., Clean Air Council v. Pruitt, 862 F.3d 1, 9 (D.C. Cir. 2017) (vacating the EPA's attempt to temporarily stay a Clean Air Act regulation without "comply[ing] with the … APA

because there is no material fact in dispute as to the illegality of the agencies' action stripping away protection for Carolina Bays and other waters important to the plaintiffs, summary judgment should be entered against the defendants.  The Suspension Rule is facially invalid and should be vacated immediately.

## STATEMENT OF FACTS

### I.    The "Waters of the United States" and the Clean Water Rule.

For decades, the outer boundaries of the "waters of the United States"—and the resulting reach of the Clean Water Act—created confusion.  Though the Supreme Court repeatedly affirmed that federal protections extend to many wetlands and streams that are not "navigable in fact," the line between "jurisdictional" and "non-jurisdictional" waters was often difficult to discern.  See Rapanos v. United States, 547 U.S. 715, 730-31 (2006) (citing Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs, 531 U.S. 159, 167 (2001) ("SWANCC"), and United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 133 (1985)).

---

…, including its requirements for notice and comment"); Open Communities All., 286 F. Supp. 3d at 152 (enjoining the defendant agency's attempt, "without notice and comment or particularized evidentiary findings, … [to] delay[] almost entirely by two years implementation of a rule" adopted by the previous administration); Pennsylvania v. Trump, 281 F. Supp. 3d 553, *1, *9-10 (E.D. Pa. Dec. 15, 2017) (enjoining two new "Interim Final Rules" based on the defendant agencies' attempt to "bypass notice and comment rulemaking"); Nat'l Venture Capital Ass'n v. Duke, 291 F. Supp. 3d 5, 8 (D.D.C. Dec. 1, 2017) (vacating the defendant agency's "decision to delay the implementation of an Obama-era immigration rule … without providing notice or soliciting comment from the public"); California v. U.S. Bureau of Land Mgmt., 277 F. Supp. 3d 1106, 1111, 1120 (N.D. Cal. Oct. 4, 2017) (holding that the defendant agency's attempt to postpone a regulation's compliance dates "after the rule's effective date had already passed … violated the APA's notice-and-comment requirements by effectively repealing the [r]ule without engaging in the process for obtaining comment from the public"); Becerra v. U.S. Dep't of the Interior, 276 F. Supp. 3d 953, 966 (N.D. Cal. Aug. 30, 2017) (holding that the defendant agency violated the APA in "fail[ing] to give the public an opportunity to weigh in with comments" before attempting to postpone a rule that had already taken effect).

In response to the Supreme Court's decisions in Rapanos, 547 U.S. at 715, and

SWANCC, 531 U.S. at 159, the agencies issued case-by-case guidance regarding the Clean

Water Act's reach in 2003 and 2008, which left many waters and wetlands, including pocosins

and Carolina bays, vulnerable.  Clean Water Rule, 80 Fed. Reg. at 37,056.  The 2008 guidance

interpreted Justice Kennedy's concurring opinion in Rapanos, which recognized the Court's past

interpretation that "a water or wetland must possess a 'significant nexus' to waters that are or

were navigable in fact or that could reasonably be so made" to be a water of the United States.

Rapanos, 547 U.S. at 759.  As the agencies acknowledged, however, "these two guidance

documents did not provide the public or agency staff with the kind of information needed to

ensure timely, consistent, and predictable jurisdictional determinations."  Clean Water Rule, 80

Fed. Reg. at 37,056.

Accordingly, the agencies spent four years evaluating "which waters have a 'significant

nexus' with traditional navigable waters, interstate waters, or the territorial seas[,]" requiring

their protection under the statute.  Id. at 37,057.  In a 2015 report synthesizing more than 1,200

peer-reviewed studies, EPA reached several "major conclusions."  Id. at 37,062-64.

First, it confirmed that "streams, individually or cumulatively, exert a strong influence

on the chemical, physical, and biological integrity of downstream waters."  Id. at 37,063.

Second, in addressing "wetlands and open waters in riparian areas and floodplains[,]" the report

determined that they "are physically, chemically, and biologically integrated with rivers via

functions that improve downstream water quality."  Id.  In addition, "[w]etlands and open waters

in non-floodplain landscape settings … provide numerous functions that benefit downstream

water integrity"—including "storage of floodwater; recharge of ground water that sustains river

baseflow; retention and transformation of nutrients, metals, and pesticides; . . . and habitats needed for stream species."  Id.

The EPA and the Corps used this scientific foundation to craft regulatory language that was "easier to understand, consistent, and environmentally more protective" than the agencies' prior regulations and guidance.  Clean Water Rule, 80 Fed. Reg. at 37,057. The bright-line standards in the Clean Water Rule included clearer protections for pocosins and Carolina bays. See id. at 37,125.

After publishing their proposed rule in April 2014, the EPA and the Corps invited members of the public to submit substantive comments for more than 200 days.  Clean Water Rule, 80 Fed. Reg. at 37,057.  The agencies received "over 1 million public comments on the proposal, the substantial majority of which supported the proposed rule[.]"  Id.  The final Clean Water Rule also reflected the "input provided through … over 400 meetings nationwide with states, small businesses, farmers, academics, miners, energy companies, counties, municipalities, environmental organizations, other federal agencies, and many others."  Id.

## II.    The New Administration's Efforts to Eliminate the Clean Water Rule.

On February 28, 2017, President Trump directed Administrator Pruitt and the Army's Assistant Secretary for Civil Works to "review the … Clean Water Rule … for consistency" with the administration's policies and "publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with law."  Exec. Order No. 13,778 at § 2(a), 82 Fed. Reg. 12,497 (Feb. 28, 2017).

On July 27, 2017, the EPA and the Corps responded to President Trump's order by proposing an immediate repeal of the Clean Water Rule.  Proposed Rule, Definition of "Waters of the U.S."—Recodification of Pre-Existing Rules, 82 Fed. Reg. 34,899 (July 27, 2017)

("Proposed Repeal Rule"). While the agencies admitted that their proposal was aimed at redefining "the scope of 'waters of the United States' that are protected under the Clean Water Act[,]" they refused to "undertake any substantive reconsideration" of the issue. Id. at 34,900, 34,903. Further, they "ma[de] clear" that they were not "soliciting comment on the specific content" of "the pre-2015 'waters of the United States' definition" that would be reinstated under the repeal rule. Id. at 34,903.

Nevertheless, the agencies received "more than 680,000 public comments" on the proposal. Mem. for the Record, Rulemaking Process for Proposed Rule: Definition of "Waters of the U.S."—Addition of an Applicability Date to 2015 Clean Water Rule at 4 (Jan. 30, 2018) ("Rulemaking Memo") (AR 0711) (Exhibit 1). These comments, the agencies acknowledged, "require[d] sufficient time to process … before the agencies c[ould] review [them] and develop appropriate responses." Id. The agencies also conceded that the process of developing a new definition would take even longer—"two years[,]" perhaps—as they would be required "to undertake continued outreach efforts, develop supporting documentation, provide for interagency review, undergo public notice on a proposed rule, process and consider those comments, and develop a final rule and supporting documents, including responses to public comments." Id. at 1.

III.    **The Suspension Rule**

Administrator Pruitt proved unwilling to wait for the repeal rulemaking to be completed. On November 16, 2017, he signed a hastily devised proposal to instead "amend the effective date of the … Clean Water Rule"—retroactively—from August 28, 2015 to "two years from the date" of the agencies' final action. Proposed Rule, Definition of "Waters of the U.S."—Amend. of

Effective Date of 2015 Clean Water Rule at 1 (Nov. 16, 2017) (prepublication version) ("Effective-Date Proposal") (Dkt. No. 30-11) (AR 0464).

When the EPA and the Corps' proposal appeared in the Federal Register on November 22, 2017—only six days after it was signed—it had been changed without explanation.  Proposed Suspension Rule, 82 Fed. Reg. at 55,542 (Dkt. No. 19-2) (AR 0001).  Rather than attempting to "delay" an effective date that had already passed, the agencies' new proposal was designed to "add an applicability date to the … Clean Water Rule" at least "two years from the date of [the agencies'] final action[.]"  Id. at 55,542.[3]

EPA and the Corps admitted that the result of their "applicability date" proposal would be no different from a more obviously illegal change to the effective date of the Clean Water Rule. See id.  Further, they expressly stated that they were changing the regulatory definition of waters of the United States: the agencies stated that the Suspension Rule would enable "the regulatory definition of 'waters of the United States' that existed *prior* to promulgation" of the Clean Water Rule to be re-instated "during the ongoing actions undertaken in response to the Executive Order."  Id.  Yet the agencies did not explain how their prior "regulatory definition" could be exhumed by an action that at the same time left the 2015 Clean Water Rule in the Code of Federal Regulations.  See id.

As with their proposed repeal, the EPA and the Corps again refused to solicit substantive public comments on the implications of a suspension.  Id. at 55,545. The agencies declared that they "d[id] not intend to engage in substantive re-evaluation of the definition of 'waters of the

---

[3] As the Office of the Federal Register has noted in its Document Drafting Handbook, federal agencies "may only [d]elay  effective dates that have not yet taken place."  Doc. Drafting Handbook (May 2017), at 3-10, https://www.archives.gov/files/federal-register/write/handbook/ddh.pdf (last visited May 23, 2018), and https://perma.cc/FUB5-VPCV (permanent link).

United States' until the[ir] Step Two rulemaking" regarding a replacement rule, id.—even though they had put in place a different definition.  The agencies accordingly refused to request public comments on "the specific content" of both the 2015 Clean Water Rule and their prior regulatory scheme.  Id.  Instead, they restricted comments to "whether it [wa]s desirable and appropriate to add an applicability date to the 2015 Rule[;]" whether the proposed two-year suspension "should be shorter or longer[;]" and "whether adding the applicability date [would] contribute[] to regulatory certainty."  Id. at 55,544.

On February 6, 2018, the EPA and the Corps finalized their Suspension Rule, "add[ing] an applicability date … of February 6, 2020" to the Clean Water Rule, effective immediately.  Suspension Rule, 83 Fed. Reg. at 5,200 (Dkt. No. 19-1) (AR 0708).  "[U]ntil the applicability date" of February 6, 2020, the EPA and the Corps declared, "the agencies will continue to implement nationwide the previous regulatory definition of 'waters of the United States'" even though the Clean Water Rule will remain in the Code of Federal Regulations.  Id. at 5,201, 5,205.

## STATUTORY FRAMEWORK

### I.     The Administrative Procedure Act.

With the Administrative Procedure Act, Congress established an essential "process for formulating, amending, … [and] repealing" regulations on both an interim and permanent basis.  5 U.S.C. § 551(5); see also, e.g., N.C. Growers' Ass'n, 702 F.3d at 770 (holding that the defendant agency had failed to satisfy the APA's notice-and-comment requirements in adopting an interim, nine-month regulation); Mack Trucks, Inc. v. EPA, 682 F.3d 87, 96 (D.C. Cir. 2012) (vacating an "interim" EPA rule promulgated without satisfying the APA's rulemaking requirements).

Three steps are required.  First, an agency must publish a "[g]eneral notice of proposed rule making" that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b).  Second, the agency must give the public "an opportunity to participate in the rule making through submission of written data, views, or arguments[.]"  Id. § 553(c).  Finally, after considering all of the relevant comments received, the agency must respond to them on the record and "incorporate in the rules adopted a concise general statement of their basis and purpose."  Id.

"The important purposes of this notice and comment procedure cannot be overstated." N.C. Growers' Ass'n, 702 F.3d at 763.  Rather than "erect[ing] arbitrary hoops through which federal agencies must jump without reason[,]" the process "improves the quality of agency rulemaking by exposing regulations to diverse public comment," "ensures fairness to affected parties," and "provides a well-developed record that enhances the quality of judicial review." Sprint Corp. v. FCC, 315 F.3d 369, 373 (D.C. Cir. 2003) (internal quotations omitted).

When a proposed regulation is aimed at eliminating protections that were previously adopted by an agency, notice and comment also "ensures that … [the] agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal."  Consumer Energy Council of Am. v. FERC, 673 F.2d 425, 446 (D.C. Cir. 1982), aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am., 463 U.S. 1216 (1983).

The requirements of notice and comment, in short, "serve important purposes of agency accountability and reasoned decisionmaking"—and they "impose a significant duty on the agency."  Am. Med. Ass'n v. Reno, 57 F.3d 1129, 1132 (D.C. Cir. 1995); see also, e.g., South Carolina v. Block, 558 F. Supp. 1004, 1015 (D.S.C. 1983) (noting that "it is only when [agency]

decisions are made in an atmosphere of public understanding, awareness, and participation that resulting rules and regulations reflect a spirit which is consistent with our form of government and thus entitled to the respect of the courts").

## II.    The Clean Water Act.

Congress began the Clean Water Act of 1972 with an unequivocal declaration of purpose. For decades, the nation's rivers, lakes, wetlands, and streams had suffered mightily as the result of industrial pollution, municipal waste, and indiscriminate filling.  See, e.g., H.R. Rep. No. 92-911, at 1 (1972); S. Rep. No. 92-414, at 7 (1971).  The Clean Water Act was intended to mark a turning point.  "The objective of this Act[,]" Congress declared in the statute's opening sentence, "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  Pub. L. No. 92-500, § 101(a), 86 Stat. 816 (1972) (codified at 33 U.S.C. § 1251(a)).

Each of the programs Congress established to achieve this objective is rooted in a single prohibition.  Under the Clean Water Act, "the discharge of any pollutant by any person" into "navigable waters" is declared unlawful in the absence of a permit.  33 U.S.C. §§ 1311(a), 1362(12).  As defined, "[t]he term 'navigable waters' means the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).

STANDARD OF REVIEW

This case arises under the Administrative Procedure Act, which provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or "without observance of procedure required by law[.]"  5 U.S.C. § 706(2)(A), (D).  "As part of this review process," the Fourth Circuit has emphasized, "courts are charged with ensuring that agencies comply with the procedural requirements of the APA" itself.  N.C.

10

Growers' Ass'n, 702 F.3d at 764.  While "review of an agency's final decision is narrow," federal courts "'must be strict in reviewing an agency's compliance with procedural rules.'"  Id. (quoting Chocolate Mfrs. Ass'n v. Block, 755 F.2d 1098, 1103 (4th Cir. 1985) (quoting BASF Wyandotte Corp. v. Costle, 598 F.2d 637, 641 (1st Cir.1979))).

Because the plaintiffs' challenge raises only legal questions regarding the defendant agencies' compliance with the Administrative Procedure Act, summary judgment is appropriate under Federal Rule of Civil Procedure 56.  See Fed. R. Civ. P. 56(a) (providing that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"); see also, e.g., Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs, No. CIV.A. 2:12-2942-RMG, 2013 WL 6488282, at *1 n.1 (D.S.C. Sept. 18, 2013) (noting that "the court in an APA review does not resolve factual questions").

## ARGUMENT

Because EPA and the Corps "refused to receive comments" on the merits of their Suspension Rule and its resuscitation of the prior regulatory definition, or "to consider or explain [the] relevant and significant issues" it raised, the agencies' adoption of the Suspension Rule was "clearly" in violation of the Administrative Procedure Act.  N.C. Growers' Ass'n, 702 F.3d at 769-70 (internal quotations omitted). This Court should accordingly grant the plaintiffs' motion for summary judgment and vacate the Suspension Rule.

## I.    The Agencies Violated Fundamental Administrative Procedure Act Public Notice and Comment Requirements.

In their rush to suspend the Clean Water Rule, the agencies arbitrarily ignored that rule's scientific basis, administrative rationale, and overwhelming public support.  They further

ignored—entirely—what suspension and repeal and the re-instatement of a prior inadequate definition will mean for water quality in the United States and how those impacts comport with the Clean Water Act's goals and requirements. These violations of basic, and fundamental, requirements of the Administrative Procedure Act require that the Suspension Rule be set aside as unlawful.

A.    The agencies violated the APA by refusing to solicit public comment on the merits of suspending the Clean Water Rule and replacing it with previous regulations and guidance.

This unlawful approach to suspending one regulation and reviving another was unanimously rejected by the Fourth Circuit in North Carolina Growers' Association v. United Farm Workers. There, the court addressed an effort by a "newly-appointed Secretary of Labor" to suspend a recent set of rules while they were "review[ed] and reconsider[ed] 'in light of issues that ha[d] arisen" since publication by the prior administration. 702 F.3d at 760. In order "to avoid a 'regulatory vacuum'" in the agency program at issue—which governed the hiring of temporary agricultural workers—the new administration reinstated previous regulations "'on an interim basis[.]'" Id. The agency instructed the public not to comment on "the merits of either [the old or new] set of regulations." Id. at 761. Instead, imposing what the Fourth Circuit termed a "content restriction," the agency declared that it would "only … consider comments concerning the suspension action itself[.]" Id. at 761.

The Fourth Circuit had "no difficulty" in concluding that the Department of Labor's content restriction had "clearly" violated the Administrative Procedure Act. Id. at 769-70. As the Court of Appeals emphasized, the APA's notice-and-comment provisions require federal agencies to "give 'interested persons an opportunity to participate in … [a] rule making through submission of written data, views, or arguments[,]'" and to "identify and respond to relevant,

significant issues raised during those proceedings." Id. at 763, 769 (quoting 5 U.S.C. § 553(c)). The Department of Labor's refusal to solicit and consider substantive public comments defied these requirements. "By the very terms of … [its rulemaking] Notice," the Fourth Circuit explained, "the Department [had] stated that it would not receive or consider comments that were not only relevant and important, but were integral to the proposed agency action and the conditions that such action sought to alleviate." Id. at 769-70. "In the … Notice," the court noted:

> the Department [had] stated that it proposed to suspend … [its new] regulations and reinstate … [its prior] regulations, because of difficulties in operating the … [agency's agricultural-worker] program under the … [new] regulations, including a lack of resources, inability to implement operations, and processing delays. … These reasons for the … Suspension were significant, substantive matters, which raised questions whether the review process provided in the … [suspended] regulations was more or less efficient than the review process provided in the … [reinstated] regulations.

Id. at 770.

"Moreover," the Fourth Circuit emphasized, the Department's "content restriction was so severe in scope"—"preventing any discussion of the 'substance or merits' of either set of regulations"—"that the opportunity for comment … [could not] be said to have been 'a meaningful opportunity.'" Id. (quoting Prometheus Radio Project v. FCC, 652 F.3d 431, 450 (3d Cir.2011)). Therefore, the Department of Labor's suspension violated the Administrative Procedure Act. Id. (citing Mack Trucks, Inc. v. EPA, 682 F.3d 87, 95-96 (D.C. Cir. 2012) (vacating an interim rule where the defendant agency had failed to satisfy the APA's notice-and-comment requirements); Buschmann v. Schweiker, 676 F.2d 352, 358 (9th Cir. 1982) (same); and Kollett v. Harris, 619 F.2d 134, 144-46 (1st Cir.1980) (same)).

The rulemaking process challenged here is indistinguishable.

In directing members of the public to say nothing about "the specific content" of the Clean Water Rule or the case-by-case regulatory scheme that would replace it, Proposed Suspension Rule, 82 Fed. Reg. at 55,545 (Dkt. No. 19-2) (AR 0001), the agencies suppressed comments that were "not only relevant and important, but … integral to the proposed agency action and the conditions that such action sought to alleviate." N.C. Growers' Ass'n, 702 F.3d at 769-70. The agencies' notice refused comment on the very purpose of the Clean Water Rule—to improve protections for water quality over the prior case-by-case regulatory scheme the agencies determined was inadequate.

The Clean Water Rule was crafted, in the agencies' words, to "*increase* … [Clean Water Act] program *predictability and consistency by clarifying* the scope of 'waters of the United States,'" including protections for pocosins and Carolina bays. Clean Water Rule, 80 Fed. Reg. at 37,054, 37,086 (emphases added). The agencies' refusal to solicit comments on stripping those protections unlawfully denied members of the public "'a meaningful opportunity'" to comment on the merits of the Suspension Rule. N.C. Growers' Ass'n, 702 F.3d at 769-70. Because the challenged rulemaking process defied this fundamental requirement of the Administrative Procedure Act, it must be set aside.

B.    In refusing to consider the substantive implications of suspending the Clean Water Rule, the EPA and the Corps violated the Administrative Procedure Act.

Under the APA, federal agencies are required to "examine the relevant data and articulate … satisfactory explanation[s]" for their actions—explanations that address every "important aspect" of the problems they seek to remedy. Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). As the Supreme Court noted in FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009), "the requirement that an agency provide reasoned explanation for its action … ordinarily demand[s] that it display awareness that it *is*

changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." Id. at 515 (emphasis in original).  When an action reverses an agency's previous position, moreover, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." Id. at 515-16.

In refusing to "undertake any substantive reconsideration" of either the Clean Water Rule or the earlier case-by-case regulatory scheme, Proposed Suspension Rule, 82 Fed. Reg. at 55,545 (Dkt. No. 19-2) (AR 0001), the EPA and the Corps flouted these requirements.  The agencies did not consider the loss of the Clean Water Rule's protections – or its clarity – in the rulemaking.  Indeed, rather than providing "a reasoned explanation … for disregarding" the extensive record assembled in support of the Clean Water Rule, Fox Television Stations, 556 U.S. at 515-16, the agencies refused to give their prior action any consideration at all. See, e.g., Proposed Suspension Rule, 82 Fed. Reg. at 55,545 (declaring that "[t]he agencies d[id] not intend to engage in substantive re-evaluation of the definition of 'waters of the United States' until the Step Two rulemaking") (Dkt. No. 19-2) (AR 0001); Suspension Rule, 83 Fed. Reg. at 5,205 (acknowledging that the agencies had failed to "to address the merits of the … [Clean Water] Rule" before suspending it) (Dkt. No. 19-1) (AR 0708).

The EPA and the Corps made no effort to demonstrate, even, that their action is consistent with the Clean Water Act and its fundamental objective of "restor[ing] and maintain[ing] the … integrity of the Nation's waters[,]" 33 U.S.C. § 1251(a); see Fox Television Stations, 556 U.S. at 515 (an "agency must show that … [a] new policy is permissible under the statute" it purports to be implementing).  While they asserted – with no basis – that the Suspension Rule "is not inconsistent" with the statute, 83 Fed. Reg. at 5,205 (Dkt. No. 19-1) (AR

0708), they admitted that they had "failed to address" a number of issues, including "the inadequacies of the … regulatory regime" the Clean Water Rule replaced and "the scientific record supporting the … [Clean Water] Rule[.]"  Id. at 5,204-05.[4]

Because "[t]he suspension or delayed implementation of a final regulation normally constitutes substantive rulemaking under APA § 553[,]" the agencies were required to consider the substance of the Clean Water Rule and their prior regulation before adopting the Suspension Rule.  Envtl. Def. Fund, Inc. v. EPA, 716 F.2d 915, 920 (D.C. Cir. 1983); see also, e.g., Nat. Res. Def. Council v. Abraham, 355 F.3d 179, 194 (2d Cir. 2004) (noting that "altering the effective date of a duly promulgated standard could be, in substance, tantamount to an amendment or rescission of the standard"); Council of S. Mountains, Inc. v. Donovan, 653 F.2d 573, 580 n.28 (D.C. Cir. 1981) (concluding that the temporary agency order at issue "was a substantive rule" requiring notice and comment "since, by deferring the requirement that coal operators supply life-saving equipment to miners, it had 'palpable effects' upon the regulated industry and the public in general'" (internal quotations omitted)); Sierra Club v. Jackson, 833 F. Supp. 2d 9, 10 (D.D.C. 2011) (noting that the "suspension or delayed implementation of a final regulation" normally "constitutes substantive rulemaking" and "requires notice and an opportunity for comment").

---

[4] The closest the agencies come to providing a rationale at all for the Suspension Rule comes via their claim that because the Clean Water Rule has been judicially stayed in 13 sparsely populated states, attempting suspension nationwide would reduce "uncertainty and confusion" from litigation.  83 Fed. Reg. at 5,202 (Dkt. No. 19-1) (AR 0708).  Because the Clean Water Rule would be in effect in 37 states without the suspension, however, the agencies have in fact changed the law and created confusion for three times as many states than had they done nothing. Further, by carrying out their rushed and obviously unlawful rulemaking, the agencies added new variables to the legal equation and triggered predictable, meritorious litigation in multiple new courts, creating yet additional legal uncertainty – the exact opposite of their putative rationale.  See Nat. Res. Def. Council v. EPA, No. 1:18-cv-1048 (JPO) (S.D.N.Y.) (challenging Suspension Rule); New York v. Pruitt, No. 1:18-cv-1030 (JPO) (S.D.N.Y.) (same); Puget Soundkeeper All. v. Pruitt, No. C15-1342JCC (W.D. Wash.) (same).

The Suspension Rule, intended by the agencies to repeal the Clean Water Rule while they replace it, was in fact the Clean Water Rule's amendment or rescission.  The agencies were therefore required to consider the substance of both the Clean Water Rule and the prior regulatory scheme they claim to have now resurrected in its place.  They did neither, and that failure violated the Administrative Procedure Act and requires that the Suspension Rule be vacated.

        C.      <u>In failing to publish the regulatory text they intend to implement, the EPA and the Corps violated the Administrative Procedure Act.</u>

In declaring that they "will administer the regulations in place prior to the 2015 Rule" without restoring their prior regulatory language to the Code of Federal Regulations, the EPA and the Corps again violated the Administrative Procedure Act.  <u>See</u> Suspension Rule, 83 Fed. Reg. at 5,200 (Dkt. No. 19-1) (AR 0708); 5 U.S.C. §§ 552(a)(1)(D)-(E), 553(d).

To provide "for the guidance of the public[,]" the APA requires federal agencies to publish the language of any substantive regulation that they intend to have legal effect.  <u>See</u> 5 U.S.C. §§ 552(a)(1)(D)-(E), 553(d).  As the Office of the Federal Register has explained in its Document Drafting Handbook, an agency that "wish[es] to restore ... [its] previous text" after suspending an existing regulation must accordingly "add the previous text back to the CFR[.]" Office of the Federal Register, Document Drafting Handbook (May 2017), at 3-11.[5]

The defendants refused to publish the text of the regulation they intended to enforce, however, stating that they would instead "administer the regulations in place prior to the 2015 Rule" while leaving the language of the Clean Water  Rule in the Code of Federal Regulations. <u>See</u> Suspension Rule, 83 Fed. Reg. at 5,200; <u>id.</u> at 5,205 (declaring that the "[a]ddition of a new

---

[5] https://www.archives.gov/files/federal-register/write/handbook/ddh.pdf (last visited May 23, 2018), <u>and</u> https://perma.cc/FUB5-VPCV (permanent link).

applicability date to a rule is not tantamount to a repeal of a rule" as "[r]epeal would mean the text of the regulation would no longer exist in the *Code of Federal Regulations*, and that is not what this final rule does; instead, it adds text to the 2015 Rule") (Dkt. No. 19-1) (AR 0708).

In addition to being unlawful, the agencies' attempt to revive their previous regulatory scheme without publishing the relevant regulatory language was arbitrary, further undermining the specious claim of "clarity and certainty" made by the agencies to justify their action.  See Suspension Rule, 83 Fed. Reg. at 5,200 (asserting that the Suspension Rule is "intend[ed] to provide clarity and certainty about the definition of 'waters of the United States' for an interim period while … [the agencies] continue to work on the two-step rulemaking process") (Dkt. No. 19-1) (AR 0708).[6]  The Suspension Rule should accordingly be vacated by this Court.  See 5 U.S.C. §§ 552(a)(1)(D)-(E), 553(d), 706(2).

## II.     The Plaintiff Organizations Have Standing to Challenge the EPA and the Corps' Unlawful Suspension of Clean Water Act Protections.

In this case, plaintiffs challenge the rash suspension of a rule that the agencies previously declared would "ensure protection for the nation's public health and aquatic resources, and increase CWA program predictability and consistency by clarifying the scope of 'waters of the United States' protected under the Act," including protections for unique Southern wetlands,

---

[6] In fact, the agencies promulgated the 2015 Clean Water Rule to provide more clarity and certainty over the preexisting case-by-case regime that was contained in the CFR.  Clean Water Rule, 80 Fed. Reg. at 37,055 (explaining that clearer jurisdictional categories would increase certainty over standards than in effect). The agencies now claim that reverting to that case-by-case regime—*not* published in the CFR—would provide more clarity and certainty than the Clean Water Rule.  Because they fail to provide any substantive basis for this reversal or to address the information that led them to reach the opposite conclusion only three years ago, the claims of additional clarity are arbitrary on their face.  See FCC v. Fox Television Stations, Inc., 556 U.S. at 515 (2009) (recognizing "the requirement that an agency provide reasoned explanation for its action … ordinarily demand[s] that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.") (emphasis in original).

pocosins and Carolina bays. Clean Water Rule, 80 Fed. Reg. at 37,054.  As organizations dedicated to protecting those "aquatic resources," representing members who regularly use them and whose use would be degraded along with the rivers, streams, and waterways, plaintiffs have standing to bring this challenge.

"To seek injunctive relief, a plaintiff must show that it is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).  Demonstrating the necessary harm as the result of a regulatory change simply requires affidavit testimony that one of an organization's members visits an area affected by the regulation and their use and enjoyment of the area would be harmed as a result of the change.  See id. at 494.  That standard is met here.

Plaintiffs have standing as conservation organizations dedicated to protecting water quality, wildlife habitat, and special places throughout the southeast and the nation on behalf of their members.[7]  We highlight three members here.

Chris Crolley, a South Carolina Coastal Conservation League member, owns Coastal Expeditions.  Decl. of Chris Crolley ¶ 1 (Exhibit 3).  From their outposts in Folly Beach, Isle of Palms, and Shem Creek, Crolley and his team of expert guides lead paddling trips to Cape Romain, Capers Island, Bulls Island, Morris Island, in the Francis Marion National Forest, on the Black River, in Rimini Swamp, on Echaw Creek, and in many other waterways in the Lowcountry.  Id. ¶ 2.  His customers include residents, tourists, and local schools—Coastal Expeditions takes 4,000 school children on educational kayak tours each year.  Id. ¶ 3.

---

[7] Declarations from plaintiffs' members are attached as exhibits 2 through 28.

Luke Pope-Corbett, a Charleston Waterkeeper member, owns and operates the Charleston Kayak Company.  Decl. of Luke Pope-Corbett ¶ 3 (Exhibit 4).  His home base is the historic Middleton Place, where he leads paddling trips on the Ashley River and its swamps.  Id. ¶¶ 5, 7.  His customers enjoy paddling those waters, where they learn about South Carolina's natural history.  Id. ¶ 4.

John Fussell, a North Carolina Coastal Federation member, is a biologist who has extensively studied wetlands, streams, and wildlife in the North Carolina coastal plain. Decl. of John Fussell ¶¶ 3, 5 (Exhibit 23).  Among the many places he frequents is the Roosevelt Natural Area at Pine Knoll Shores on the central North Carolina coast.  Id. ¶¶ 9-12.  That protected area is, for now, connected to a privately-held maritime forest that contains a small wetland which provides additional habitat, but loses clear protection of the Clean Water Act without the bright lines set out in the Clean Water Rule.  Id. ¶ 13.

These are just a few of plaintiffs' numerous members who use and enjoy waters that are better and more clearly protected by the Clean Water Rule. Others include avid trout fishermen, who regularly fish in the mountains of Maryland, Decl. of Robert Irvin ¶¶ 5-6 (Exhibit 7), as well as New York and Montana, Decl. of Greg Belcamino ¶¶ 11-13 (Exhibit 6); a landowner in western North Carolina concerned about the effect of upstream development on the Linville River as it traverses his property, Decl. of Jay Mills ¶¶ 8-13 (Exhibit 10); a retired environmental scientist with the Corps who canoes weekly on rivers throughout central Virginia, Decl. of Harold Wiggins ¶¶ 2-3, 9-10 (Exhibit 22); a retired former Director of EPA's Office of Water Enforcement and Permits and Acting Administrator for Water who implemented the Clean Water Act when it was initially passed and is concerned about weakened protections for streams near her home in Fredricksburg, Virginia, Decl. of Rebecca Hanmer ¶¶ 8, 29-46 (Exhibit 20); an avid

whitewater paddler who also teaches kids in Maryland about canoeing and kayaking, Decl. of

Gary Steinburg ¶¶ 7,9-10, 15-20 (Exhibit 15); a sailor and sportsman who lives on Lake Norman

in central North Carolina and is concerned about the lake's water quality, Decl. of Billy Wilson

¶¶ 4-5, 16-20 (Exhibit 28); and a paddler worried that the Chattahoochee River will be polluted

such that he would be forced to find other places to kayak, Decl. of Alan Kendall ¶¶12-16

(Exhibit 12).

As the agencies acknowledged in adopting the Clean Water Rule delayed by the

Suspension Rule, both "[p]eer-reviewed science and practical experience demonstrate that

upstream waters, including headwaters and wetlands, significantly affect the chemical, physical,

and biological integrity of downstream waters by playing a crucial role in controlling sediment,

filtering pollutants, reducing flooding, providing habitat for fish and other aquatic wildlife, and

many other vital chemical, physical, and biological processes."  Clean Water Rule, 80 Fed. Reg.

at 37,055.  The regulation confirmed that the protective reach of the Clean Water Act extends to

wetlands and tributaries "that require protection in order to restore and maintain the chemical,

physical, or biological integrity of traditional navigable waters[.]"  Id.

 By limiting the extent of upstream protections the Suspension Rule will thus harm the

integrity of "traditional navigable waters," "the territorial seas[,]" and other downstream waters.

Id.  The upstream waters identified in the rule as jurisdictional function as integral parts of the

aquatic environment, and if these waters are polluted or destroyed, there is a significant effect

downstream."  Id. at 37,056.  This conclusion was based on more than 1,200 studies analyzed in

the agencies' Connectivity Report.  See id. at 37,057; Office of Research and Development,

EPA, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of*

*the Scientific Evidence* (Jan. 2015) (Exhibit 29).

Pocosins and Carolina bays received particular attention and clearer protection from the agencies in the Clean Water Rule. Pocosins were recognized as serving "as the source of water for downstream waters," 80 Fed. Reg. at 37,072, while Carolina bays close "to each other or to streams" were recognized as "providing for hydrologic connection to each other and to downstream waters." Id. As a result of these connections, both wetland types were found to filter pollution and provide important habitat—important goals of the Clean Water Act. Id.

When promulgating the Clean Water Rule, the agencies emphasized that the prior regulatory regime was inadequate in protecting pocosins, Carolina bays, and other jurisdictional waters. Under the vague standards that preceded the Clean Water Rule, the agencies evaluated "the jurisdiction of waters on a case-specific basis far more frequently than [wa]s best for clear and efficient implementation of the CWA." Proposed Rule, Definition of "Waters of the U.S." Under the Clean Water Act, 79 Fed. Reg. 22,188 (Apr. 21, 2014). The Clean Water Rule "clarif[ied] and simplif[ied]" the implementation of the statute "through clearer definitions and increased use of bright-line boundaries to establish waters that are jurisdictional by rule"— "limit[ing] the need for case-specific analysis." Clean Water Rule, 80 Fed. Reg. 37,055.

As the agencies recognized in proposing and finalizing the Clean Water Rule, it improved protection for essential upstream waters as compared to the prior regulatory scheme, thereby protecting downstream waters. Suspending that rule strips away those protections, putting rivers, lakes, streams, and wetlands used and enjoyed by plaintiffs' members in danger. Loss of those protections degrades these members' enjoyment of waters they have visited regularly and will continue to visit. A ruling by this Court vacating the Suspension Rule would restore the protections, remedying that harm. Therefore, plaintiffs have standing. See Summers, 555 U.S. at

494 (stating that government conceded standing where member had visited location affected by rulemaking and intended to do so again in the future).

## CONCLUSION

As Judge Wilkinson noted in his concurring opinion in North Carolina Growers' Association, "[n]o one expects agency views to be frozen in time or … immune from electoral mandates[.]"  702 F.3d at 772.  "Changes in course, however, cannot be solely a matter of political winds and currents."  Id.  Instead, "[t]he Administrative Procedure Act requires that the pivot from one administration's priorities to those of the next be accomplished with at least some fidelity to law and legal process.  Otherwise, government becomes a matter of the whim and caprice of the bureaucracy[.]"  Id.

The suspension challenged in this case, like the one at issue in North Carolina Growers' Association, is the product of "whim and caprice[,]" not "fidelity to law and legal process."  Id. To borrow Judge Wilkinson's words, "the very rudiments of process were absent here"—and "[i]t quite defies belief that the … Notice of Proposed Suspension … deemed comments on the merits of the regulations to be suspended or the regulations to be reinstated out of bounds."  Id. Because the EPA and the Corps failed to comply with the fundamental requirements of the Administrative Procedure Act, this Court should uphold the rule of law and vacate the Suspension Rule.

Respectfully submitted this 25th day of May, 2018.

s/ J. Blanding Holman IV
D.S.C. Bar No. 9805
bholman@selcsc.org
Southern Environmental Law Center
463 King Street, Suite B
Charleston, SC 29403
Telephone:  (843) 720-5270
Facsimile:  (843) 414-7039

Frank S. Holleman III
Bar No. 1911
fholleman@selcnc.org
Geoffrey R. Gisler
N.C. Bar No. 35304
*Admitted pro hac vice*
ggisler@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC  27516-2356
Telephone:  (919) 967-1450
Facsimile:  (919) 929-9421

*Attorneys for Plaintiffs*